**UNITED STATES of America**

v.

**Leonard A. PELULLO.**

**No. Crim. 91–00060.**

United States District Court,
E.D. Pennsylvania.

June 9, 1998.

## FINDINGS OF FACT AND CONCLU-SIONS OF LAW RE: THE RE-MAND HEARING

ROBERT F. KELLY, District Judge.

On January 9, 1997, the United States Court of Appeals for the Third Circuit remanded this matter for the purpose of conducting an evidentiary hearing with regard to Defendant Leonard A. Pelullo's motion for a new trial.[1,2] Specifically, the court stated, "On remand, the government should be afforded an opportunity to demonstrate, consistent with its burden of proof, that Pelullo would have testified during his first trial even if the withheld material had been turned over." The court did not state what standard of proof applied to the government's burden. That then, is the first issue for this Court to decide.

## STANDARD OF PROOF

In similar cases, the Supreme Court has consistently held that the preponderance standard applies when the government has the burden of showing that evidence is not tainted by a constitutional violation, and therefore is not subject to suppression under the exclusionary rule. *See Lego v. Twomey,* 404 U.S. 477, 488–89, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *U.S. v. Matlock,* 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Nix v. Williams,* 467 U.S. 431,

---

1. *U.S. v. Pelullo,* 105 F.3d 117 (1997). A hearing was conducted on January 23, 1998.

2. The court continued the remand hearing until January 23, 1998 at Mr. Pelullo's request due to

the pendency of a separate criminal trial. *See United States v. Pelullo,* 961 F.Supp. 736 (D.N.J. 1997).

444 n. 5, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

In *Lego,* the defendant contended the police coerced his confession. The trial court admitted the confession, finding the state had proved the confession was voluntary by a preponderance of the evidence. The defendant challenged this finding contending that the standard was beyond a reasonable doubt. In upholding the trial court, the Supreme Court held,

> To reiterate what we said in *Jackson:* When a confession challenged as involuntary is sought to be used against a criminal defendant in his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered. Thus the prosecution must prove that at least by a preponderance of the evidence that the confession was voluntary.

*Id.* 404 U.S. at 488–89, 92 S.Ct. 619 (citations omitted).

In *Matlock,* where the Supreme Court remanded the case for an evidentiary hearing on the issue whether the evidence was sufficient to establish consent to search, the court noted that the district court had correctly applied the preponderance standard at the suppression hearing:

> [T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence. See *Lego v. Twomey,* 404 U.S. 477, 488–89, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

*United States v. Matlock,* 415 U.S. at 178 n. 14, 94 S.Ct. 988.

In *Nix v. Williams,* the police obtained a statement from a murder suspect, in violation of his sixth amendment right to counsel, identifying the location of the victim's body. The Supreme Court reversed the defendant's initial conviction because the state admitted the statement into evidence. On retrial, the state introduced evidence of the condition of the victim's body, which the police found using the defendant's statement. The defendant contended that evidence of the victim's body should have been suppressed as "poisonous fruit" of the sixth amendment viola-

tion. The Supreme Court disagreed, holding that the state's evidence established by a preponderance of the evidence that the police would have inevitably discovered the body without the defendant's statement and therefore, application of the exclusionary rule was not warranted. *See Nix v. Williams,* 467 U.S. at 448–50, 104 S.Ct. 2501. In *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Supreme Court held that a pretrial line-up violated the defendant's sixth amendment right, but remanded the case for a hearing to give the government the opportunity to establish that the illegal identification did not taint the later in-court identification. Justice Brennan stated that the clear and convincing standard would apply in the suppression hearing on remand, but did so without analysis of the issue. *See id.* at 240, 87 S.Ct. 1926. Justice Brennan's decision in *Wade* preceded the cases cited above in which the Supreme Court did analyze the standard of proof issue. The Supreme Court has expressly declined to follow Justice Brennan's view that the clear and convincing standard should apply in other suppression contexts. *See Lego v. Twomey,* 404 U.S. at 492, 92 S.Ct. 619 (J. Brennan, dissenting); *Nix v. Williams,* 467 U.S. at 459, 104 S.Ct. 2501; *Colorado v. Connelly,* 479 U.S. at 185–86, 107 S.Ct. 515. The Supreme Court subsequently limited *Wade* to line-up cases. *See Nix v. Williams,* 467 U.S. at 444 n. 5, 457 n. 8, 104 S.Ct. 2501 (J. Stevens, concurring) (1984). In limiting *Wade,* the court reasoned that a higher standard of proof was appropriate in a suppression hearing involving an illegal line-up because a constitutional defect in a pretrial identification could cast doubt on the reliability of the subsequent in-court identification. Here, there is no contention that Mr. Pelullo's in-court testimony was rendered unreliable by the *Brady* violation.

After reviewing the above cases together with the briefs submitted by Mr. Pelullo's counsel, I am convinced that the government is required to prove by a preponderance of the evidence that Leonard Pelullo would have testified at the first trial even if the *Brady* material had been supplied to him. I now make these following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. On July 3, 1991, a jury convicted Mr. Pelullo of 49 counts of mail fraud and one count of racketeering (Count 55). (For the purpose of these findings, the 1991 trial will be referred to as the "first trial.") On appeal, the Third Circuit vacated 48 of the 49 wire fraud counts and Count 55. The Third Circuit affirmed one wire fraud count, Count 54.

2. Count 54 charged Mr. Pelullo with conducting a fraudulent scheme involving the diversion of $114,000 in funds belonging to Palm Beach Heights & Development Corporation ("PBH"), a wholly owned subsidiary of the Royale Group Limited Corporation ("Royale"). The indictment charged that in February 1986, Mr. Pelullo used these corporate funds to repay a personal debt Mr. Pelullo owed to Anthony DiSalvo, a loanshark associated with the Philadelphia mafia. Racketeering Act ("RA") 60 of Count 55 charged this same scheme as a predicate act of Mr. Pelullo's racketeering activity.

3. At a second trial, on January 29, 1993, a jury convicted Mr. Pelullo of 49 wire fraud counts and one RICO count. On January 24, 1994, the Third Circuit of Appeals reversed that conviction on all counts. In October 1994, Mr. Pelullo was tried for a third time. That trial ended when the jury was unable to reach a verdict. Following a retrial in January 1995, the jury again convicted Mr. Pelullo of 46 counts of wire fraud and Count 55. (For the purpose of these findings, the 1995 trial will be referred to as the "1995 retrial")

4. On appeal of the 1995 retrial, Mr. Pelullo challenged both the original conviction on Count 54 and the convictions on the other counts from the 1995 retrial. The Third Circuit vacated Mr. Pelullo's conviction on Count 54 on the ground that the government had failed to produce evidence constituting *Brady* material which Mr. Pelullo could have used to impeach government witnesses regarding Count 54 at the first trial. *See United States v. Pelullo*, 105 F.3d 117 (1997). These items consisted of: (i) rough notes of a June 14, 1990 interview of Mr. Pelullo written by FBI Special Agent Randall Wolverton during which Mr. Pelullo discussed the $114,-000 transaction; (ii) a memorandum of an interview of Phillip Leonetti, the former underboss of the Philadelphia mafia, by an IRS agent and the agent's rough notes of the interview; and (iii) FBI surveillance logs of the Florida residence of Nicodemo Scarfo, the former boss of the Philadelphia mafia.

5. Mr. Pelullo obtained the *Brady* material before the 1995 retrial. Thus, the *Brady* convictions found by the Third Circuit with respect to the first trial did not require reversal of the convictions from the 1995 retrial. However, Mr. Pelullo asserted that the *Brady* violation tainted his convictions from the 1995 retrial because the government used a portion of his testimony from the first trial at the 1995 retrial. As the Third Circuit noted, Mr. Pelullo contended the court should have suppressed his testimony from the first trial because:

> [H]e was forced to take the stand at the first trial due solely to the government's failure to abide by its obligation under *Brady*. In other words, Mr. Pelullo argues that because he had no other way to impeach the government witness (sic) he was compelled to take the stand himself and rebut their testimony.

*Id.*, at 124.

6. The Third Circuit agreed that Mr. Pelullo's testimony from the first trial would be subject to suppression if the district court determined on remand that it was the "inadmissible fruit of a poisonous tree" of the *Brady* violation. *Id.* at 125. The Third Circuit remanded for an evidentiary hearing to give the government the opportunity to establish "whether Mr. Pelullo would have testified in the first trial anyway even if the government had complied with its *Brady* obligations." *Id.* at 125. The Third Circuit identified the relevant portion of Mr. Pelullo's testimony from the first trial as follows:

Q: So, there was a debt to Tony DiSalvo?

A: Yes.

Q: And that debt was repaid?

A: Yes.

Q: When was it repaid?

A: Well, it was paid, my brother gave me $55,000 in September and he has the cashier's check. I think I gave it to you

and then my dad gave me a $180,000 out of the closing on the restaurant and his property and that was $230,000, then I gave Pete $20,000. It must have been some time in '87 that we paid it off. Okay, now and Pete gave the money to, I guess it ended up with DiSalvo.

Q: Okay, we've heard testimony from a man named Leonetti about the use of the Mafia to collect on this loan.

First of all, did you ever have any contact with Mr. Leonetti?

A: I have knowledge of who Mr. Leonetti is. I grew up in South Philadelphia. I know these people from seeing them on the street and maybe running into them at a restaurant. Do I know them? Do I associate with them? No.

Q: Okay. Did he contact you about this loan?

A: Never.

Q: Did he contact your family?

A: Yes, what happened was my brother has a business in South Philadelphia, he had a recording company at 20th and Wyomissing. Most of these people are from that area and they walked into Pete and told him that hey had been assigned to collect the loan and Pete got in touch with me and said we have a problem and that's how it came about.

Q: Okay, did you have any concern for your family at that point?

A: Absolutely, they are dangerous people.

Q: And what was the time period again that the loan was repaid, September of '86, August and them '87, sometime in January?

A: Okay, I think it was about that time.

Q: Do you know a man named Nicodemo Scarfo?

A: I know who he is. I know him from South Philadelphia. I could have run into him at a restaurant, I know who he is. Do I?

Q: Do you?

A: Associate with him, no.

Q: Did you have any conversations with him about this loan?

A: Never.

Q: Okay, have you ever been to his home?

A: Yes.

Q: How did that come about?

A: What happened was, I was in Miami and a man by the name of Sam LaRusso. Sam had worked for my father about 30 years ago as a laborer. And he told me he had a job in Fort Lauderdale, would I come up and help him? I said sure, Sam, I'll be up to see it.

I went up to Fort Lauderdale and when I get there he tells me where I'm at. I didn't know it was Scarfo's house. And he said Leonard, he said, I need some help here. There's a construction job. I don't have any people here and I need to get a permit. I said, Sam, I don't want to get involved. Don't put me in this position.

And I wasn't threatened, but the situation with Sam was that Sam was a prisoner, basically, until this work was done and he asked me to get him a permit, get him some contractors to get the work done, otherwise he was going to have a problem with these people. And I looked at the job, I sent Keith Swenson there and I said see what you can do about getting him a permit and get him some plans and get the job done and let's get the hell out of here. That's what I told him.

Q: Is that the only time you were ever at his house?

A: I might have been there twice with Sam, because he needed some technical help on how to do something and I tried to limit my exposure there, yes.

*United States v. Pelullo,* 105 F.3d at 120–21.

7. As noted, the Third Circuit found that the government's failure to disclose rough notes taken by Agent Wolverton during a June 14, 1990 interview with Mr. Pelullo constituted a *Brady* violation. The facts regarding this interview are relevant to the analysis of the remand issue.

8. During the investigation leading up to his indictment, Mr. Pelullo requested a meeting with the prosecutor and Agent Wolver-

ton. As Mr. Pelullo stated, he wanted "to speak to them and try and straighten this out." GX 12 at 196. Mr. Pelullo was accompanied by his attorney, Fred Schwartz. According to the testimony of Agent Wolverton, and FBI Agent Michael Leyden, during this interview Mr. Pelullo stated that he had used the $114,000 in funds belonging to PBH to repay his personal loan to DiSalvo. At the first trial, Mr. Pelullo denied making this statement.

9. On January 23, 1998, the Court conducted an evidentiary hearing to give the government the opportunity to establish that Mr. Pelullo's testimony from the first trial was not inadmissible "fruit of the poisonous tree." At the hearing, the government offered evidence consisting primarily of excerpts of the testimony from the first trial and statements of Mr. Pelullo from other proceedings, for the purpose of showing that Mr. Pelullo would have testified at the first trial even if the *Brady* material had been produced.

Although Mr. Pelullo had no burden to produce any evidence, Mr. Pelullo offered the testimony of Glenn Whitaker, one of his attorneys from the First trial, to support his contention that he was compelled to testify at the first trial. On direct, Mr. Whitaker explained the reason Mr. Pelullo testified at the first trial as follows:

Q: Mr. Whitaker, were you involved in the decision to have Mr. Pelullo testify at the first trial?

A: I was.

Q: What were the determining factors in that decision to have him testify?

A: Well, primarily that we had two F.B.I. agents testifying abut a meeting at which Mr. Pelullo was present, and their testimony needed to be rebutted about a particular reference that's contained in this 302. . . .

Q: Is that the reference that is at Page JA–774, the last four lines?

A: Yes. The reference is that a $114,000 wire transfer from the debtor-in-possession account to LRP, Inc., was used to repay Tony DiSalvo. We felt it essential

that we call Mr. Pelullo to respond to that, because, quite frankly, there was no other way to deal with that issue.

In addition, we felt that we were required to respond to the testimony of Mr. Leonetti about his contacts with Mr. Pelullo, and, again, there was no one else available to deal with that, and there was no effective cross-examination material to deal with those witnesses.

TR. at 17–18.[3]

11. On cross-examination, Mr. Whitaker testified that, with respect to Agent Wolverton's rough notes of the June 14, 1990 interview, Mr. Pelullo specifically waived his fifth amendment privilege so that he could testify about what Mr. Pelullo claimed he told the agents about the $114,000 transaction during the June 14, 1990 interview:

Q: And you're saying that instead of having those [rough] notes, you put Leonard Pelullo on the stand to say that he told the agents something different, is that correct?

A: In part, that's one of the reasons. ( . . . . )

. . . .

Q: No. I'm not focusing on that yet. I'm simply saying, with respect to Wolverton and Leyden's direct testimony, you put Pelullo on to deny that he made the statement that they attributed to him about the $114,000 in the 302?

A: In part, he was put on the stand to deny that the statement that's contained in the 302, which I believe was the subject of testimony by Mr. Wolverton, was made.

Tr. at 40.

12. With respect to the testimony of government witness Phillip Leonetti, Mr. Whitaker testified on cross-examination that Mr. Pelullo waived his fifth amendment privilege so that Mr. Pelullo could contradict Leonetti's testimony that he had contact with Pelullo:

3. The notation "Tr." refers to the transcript of the remand hearing held on January 23, 1998.

Q: Okay. And so you're saying he took the stand solely to contradict Leonetti about the contact the two of them had?

A: You keep using the word "solely," and that's not correct.

Q: Well, solely with respect to Leonetti's testimony?

A: With respect to Leonetti's testimony, he took the stand to contradict that he had a contact with Leonetti.

Tr. at 55–56.

13. Mr. Whitaker testified on cross-examination that Mr. Pelullo's decision to waive his fifth amendment privilege at the first trial was based only on the government's evidence pertaining to Count 54, and that the government's proof pertaining to the other 53 wire fraud counts did not influence Mr. Pelullo's decision to testify:

Q: And are you saying that offering a defense to those other 53 counts did not factor in your decision to put Leonard Pelullo on the stand?

A: Not really.

Q: No what? Not really what?

A: It did not. I felt we had adequate defenses and adequate presentation as to the other counts. Count 54 was the one I was most concerned about.

Tr. at 61.

14. Mr. Whitaker acknowledged that before Mr. Pelullo took the stand at the first trial, Mr. Pelullo and Mr. Whitaker were aware that government witness Keith Swenson could testify that he had seen Mr. Pelullo at Mr. Scarfo's house in Florida:

Q: And you knew, didn't you, before he took the stand, and Leonard Pelullo knew, that Keith Swenson has been to Scarfo's house because Leonard Pelullo had sent him there and had seen Leonard Pelullo at Scarfo's house?

A: I believe that's the case.

Tr. at 63.

15. In sum, Mr. Whitaker testified specifically that Mr. Pelullo's only reason for waiving his fifth amendment privilege was to defend against Count 54, and the corresponding RA 60, by testifying that: (a) Mr. Pelullo did not admit to Agents Wolverton and Ley-den that he used the $114,000 to repay Mr. DiSalvo; (b) to the contrary, Mr. Pelullo told the agents that he used the $114,000 to pay an "intercompany debt"; and (c) he did not have contact with Mr. Leonetti and Mr. Scarfo at Mr. Scarfo's house in Fort Lauderdale, Florida in January of 1986 concerning the DiSalvo loan.

16. At the first trial, Mr. Pelullo faced an indictment charging him with 55 separate criminal counts: 54 counts of wire fraud and 1 racketeering count. Each separate wire fraud count exposed Mr. Pelullo to a five year sentence of imprisonment.

17. These multiple counts comprised three separate fraudulent schemes conducted by Mr. Pelullo. *See* Indictment. The first scheme, charged in Counts 1 through 53 and the corresponding RA 1 through 59, alleged Mr. Pelullo fraudulently diverted to his personal benefit $1.6 million in loan proceeds advanced to Royale, a public corporation controlled by Mr. Pelullo, by American Savings & Loan Association ("American"). The second scheme, charged in RA 61 through 72, involved Mr. Pelullo's diversion of an additional $471,000 of Royale corporate funds to his personal benefit. The third Fraudulent scheme, charged in Count 54 and RA 60, involved Mr. Pelullo's diversion of the $114,000 of PBH corporate funds to repay his personal debt to Mr. DiSalvo.

18. The first trial began on June 17, 1991 and ended on July 3, 1991. The government presented approximately 30 witnesses to prove Mr. Pelullo's two schemes to defraud Royale and American by diverting loan proceeds advanced to Royale to his personal benefit. The government called former Pelullo employees (Rubin, Swenson, McDonald, Comegys, Williams, Hellhake, Bershtein, Feldman) and several of Royale's outside accountants to establish the schemes. The government also called several witnesses to establish how Mr. Pelullo diverted over $2 million in Royale corporate funds to his personal benefit. Two employees from American testified as to the draw request process through which Mr. Pelullo falsely overstated the construction costs to claim loan proceeds from American. In support of these wit-

nesses, the government also introduced voluminous documentary evidence. The following is a summary of the government's proof at the first trial:

(A) Mr. Pelullo was the chief executive officer of Royale, a public corporation engaged in real estate development. Royale was in precarious financial condition. From 1983 to early 1986, Mr. Pelullo exercised complete control over Royale and its board of directors.

(B) In 1983, Royale acquired six hotels in Florida (the "art deco hotels"). In June 1984, Royale obtained a loan with American for $13.5 million to finance the acquisition and renovation of the art deco hotels. American retained $3.7 million of the loan to pay for the renovation costs and disbursed these funds only after Royale submitted certified draw requests containing an itemization of costs incurred by Royale. Under the terms of the loan, Royale had to incur the costs before requesting payment. The loan was increased twice and by the end of 1985, Royale had requested and received approximately $6.2 million through draw requests.

(C) Without prior approval from the Royale board or competitive bidding, Mr. Pelullo arranged for Delta Development & Construction Corp. ("Delta"), a company he controlled, to do the renovation work on the art deco hotels. By virtue of his control over Royale and its board, the willful circumvention of standard corporate procedures, and the use of Delta, Mr. Pelullo was able to conduct two fraudulent schemes whose objects were to divert Royale corporate funds for his personal use.

(D) In the draw request Mr. Pelullo submitted between July 1984 and November 1985 to obtain renovation loan proceeds, he overstated renovation costs by at least $3 million. Not only did Mr. Pelullo submit false requests, he submitted false invoices and related documents to support the draws. American relied on the draw request and supporting documents to disburse loan proceeds.

(E) To conceal his schemes, Mr. Pelullo stopped maintaining accounting records for Royale and instructed American to disburse loan proceeds directly to Delta checking accounts, thus completely circumventing any accounting of the loan funds by Royale's public auditors and shareholders.

(F) After American wired loan proceeds to Delta's accounts, they were disbursed only at Mr. Pelullo's directions. The government's evidence showed how Mr. Pelullo used Royale's loan proceeds to finance his private business projects in Philadelphia and his horse farm in Chester County, Pennsylvania. Mr. Pelullo also used Royale's loan proceeds for personal expenses, such as: buying real estate in Chester County, Pennsylvania; buying a ranch in Montana; repaying a loan his father owed to a Philadelphia bank; and repaying Mr. Pelullo's gambling debt to an Atlantic City casino. Mr. Pelullo also arranged for his brother, Arthur, to deliver $100,000 of Royale loan proceeds in cash to Mr. Pelullo at a casino in Puerto Rico.

19. The evidence as to the third scheme showed that Mr. Pelullo had a loan from a loanshark named Mr. DiSalvo. When Mr. Pelullo failed to repay the loan, Mr. DiSalvo sought the assistance of Philip Leonetti, a member of the Philadelphia mafia. Mr. Leonetti agreed to help collect the debt in exchange for half the amount collected. In late 1985 or early 1986, Mr. Leonetti and his uncle, Nicodemo Scarfo, who was the boss of the Philadelphia mafia, met with Mr. Pelullo and advised him to repay Mr. DiSalvo. As a result, Mr. Pelullo instructed a Royale employee to wire transfer $114,000 out of a PBH bank account to a Pelullo-family corporation in Philadelphia on February 25, 1986, where it was converted to cash and delivered to Mr. DiSalvo.

20. During a sidebar conference, the government proffered the testimony of Mr. Swenson, a former employee of Mr. Pelullo, regarding his trips to Mr. Scarfo's Florida residence as relevant proof of Mr. Pelullo's association with Mr. Scarfo and Mr. Leonetti. *See* GX 17. However, the court ruled that this testimony was not admissible in the government's case-in-chief.

21. On July 1, 1991, Mr. Pelullo testified on direct in his own defense. The transcript of his direct testimony begins on page 80, and concludes on page 203. This excerpt of

the transcript contains approximately 7 pages of sidebar discussions, which results in a net total of 116 pages of testimony. (GX 12). Of the total testimony, six (6) of the 116 pages (194–200) were devoted to the subject of the $114,000 transaction. The other testimony (over 110 pages) pertained to matters relating to the government's proof of the other two schemes to defraud Royale of over $2 million in loan proceeds and is completely unrelated to Count 54/RA 60. In sum, the vast majority of Mr. Pelullo's testimony was dedicated to providing a defense to the heart of the government's case, namely the two fraudulent schemes charging Mr. Pelullo with defrauding American and Royale of over $2 million. In substance, Mr. Pelullo asserted he was entitled to the loan proceeds which the government contended he had fraudulently diverted to his own use.

22. In his direct testimony, Mr. Pelullo discussed at length: (a) his role in financing Royale; (b) the background of the art deco loan; (c) various problems with the construction process; (d) the bank inspection process; and (e) his contention that he was entitled to disburse funds of a public corporation to himself.

23. At the conclusion of his testimony, Mr. Pelullo stated:

Q: Now with respect to money that was paid over to Delta pursuant (sic) to this loan, did Delta provide value for all the money which it received from the loan?

A: Delta earned every dime that we put into that job and we gave up a lot of consideration in doing that job. And we gave full value for that job. Even the bank commented that they couldn't believe we were getting it done for the prices we were doing it for.

Q: Did you ever take money from Royale to which you were not entitled?

A: Absolutely not.

24. Mr. Pelullo also testified that, contrary to the government's proof, he had not used the $114,000 to repay Mr. DiSalvo. However, Mr. Pelullo also introduced other evidence, separate and apart form his own testimony, to establish his contention that the $114,000 was not used to repay Mr. DiSalvo. Mr. Pelullo's father, Peter Pelullo, testified for the defense that: (a) Royale owed him money for the hotel renovation project and the $114,000 wire transfer to LRP was a partial payment of the money owed to him; (b) he used the $114,000 for personal reasons; and (c) he did not use it to repay Mr. DiSalvo. GX 18.

25. Peter Pelullo also testified that in August of 1986, his son, Arthur Pelullo, informed him that Leonard Pelullo had borrowed money from Mr. DiSalvo and that Mr. Scarfo and Mr. Leonetti had advised the Pelullo family to repay Mr. DiSalvo. Peter Pelullo testified he assisted Mr. Pelullo in repaying Mr. DiSalvo by borrowing money from a bank in September of 1986, which he gave to another son, Peter, to repay the money that Mr. Pelullo owed to Mr. DiSalvo. Mr. Pelullo introduced bank documents supporting this version. Leonard Pelullo's two brothers, Arthur and Peter, did not testify for the defense. However, they were available to testify on behalf of Mr. Pelullo. (Tr. at 56–59; GX 18). Mr. Pelullo also had a copy of a $55,000 bank check drawn on his brother's account and made payable to Mr. DiSalvo which Mr. Pelullo contended was used to repay his debt to Mr. DiSalvo. GX 19.

26. As noted, the Third Circuit vacated all counts of conviction from the First trial, except for Count 54. A second trial was conducted in January 1993 (the "second trial"). However, because the Third Circuit had affirmed Count 54, this Court granted the government's pretrial motion for a ruling that under the doctrine of collateral estoppel, the wire fraud offense charged in RA 60 was established by Mr. Pelullo's conviction on Count 54. Thus, whether Mr. Pelullo had committed the fraudulent scheme involving the diversion of $114.000 in PBH funds to repay Mr. DiSalvo was not at issue in the second trial. (The government was still required to prove that this offense was part of the pattern of racketeering activity charged in Count 55).

27. On January 25, 1993, Mr. Pelullo testified in his own defense at the second trial.

The transcript of Mr. Pelullo's direct testimony begins on page 146 and concludes on page 202. This excerpt of the transcript contains 56 pages. Mr. Pelullo again testified about his "entitlement" defense to his personal use of the Royale funds in essentially the same manner he had during the first trial. In his direct, Mr. Pelullo also discussed: (a) his role in financing Royale; (b) his justification for disbursing art deco loan proceeds to his personal benefit; (c) how he computed the costs submitted to American in the draw process; (d) his explanation for various items that the government had established were fraudulent; (e) his explanation for why two international accounting firms were unable to complete their audit; and (f) his efforts to buy a casino in Puerto Rico for Royale. The only significant difference between Mr. Pelullo's testimony during the first trial and his testimony during the second trial was that Mr. Pelullo did not testify about the $114,000.

28. I have reviewed the record from the first trial and read in its entirety the direct and cross-examination of Mr. Pelullo in that trial. I have read in its entirety Mr. Pelullo's testimony at his second trial. I have compared Mr. Pelullo's first trial testimony and Mr. Whitaker's closing argument with Mr. Whitaker's testimony as to the reasons why Mr. Pelullo testified at the first trial.

29. I find that the government has established by clear and convincing evidence that Mr. Pelullo waived his fifth amendment privilege and voluntarily agreed to testify at the first trial so that Mr. Pelullo could present a defense to the jury by explaining that he was entitled to use the Royale corporate funds in the manner that he did, and therefore, he did not commit fraud as charged in the indictment. I further find that the Brady material does not and cannot establish or even support the "entitlement" defense Mr. Pelullo sought to establish through his direct testimony. I find that the Brady material is irrelevant to the "entitlement" defense Mr. Pelullo advanced through his direct testimony at the first trial. As the Third Circuit has held: "the withheld evidence clearly could have been utilized by the defense during the first trial to undermine the government's case on Count 54 by way of impeaching the

testimony of three government witnesses: Mr. Leonetti, Mr. Wolverton and Mr. Kurtz (sic)." Id. 105 F.3d at 122. Because the Brady material would not have supported Mr. Pelullo's "entitlement" defense, having the Brady material available at the first trial would not have changed Mr. Pelullo's decision to testify.

30. The best evidence of Mr. Pelullo's reason for waiving his fifth amendment privilege is the substance of what Mr. Pelullo actually testified about after waiving the privilege. The record of the first trial establishes that the overwhelming majority of Mr. Pelullo's testimony was dedicated to Mr. Pelullo's explanation as to why he was entitled to use the Royale loan proceeds for his personal benefit.

31. The government's evidence with respect to Counts 1 through 53, the fraudulent scheme involving Mr. Pelullo's diversion of the $1.6 million dollars in loan proceeds advanced to Royale for the art deco hotels, was strong. As noted, the government called [30] witnesses and presented over 100 exhibits in support of the proof of this scheme. Mr. Pelullo's ability to control Royale, Delta and their respective bank accounts was clearly established. Mr. Pelullo could not dispute the overwhelming evidence showing that Mr. Pelullo disbursed $1.6 million in loan proceeds advanced to Royale for the art deco hotels project and $471,000 in working capital to his private companies and personal bank accounts. The government presented clear evidence that Mr. Pelullo had caused American to disburse the loan proceeds to Royale through false representations regarding the construction costs incurred for the art deco hotels. The government's evidence clearly established that Mr. Pelullo had intentionally disregarded standard corporate practices and "stonewalled" Royale's public accountants to conceal his diversion of corporate funds. The inference of Mr. Pelullo's intent to defraud was obvious. Absent an explanation justifying Mr. Pelullo's diversion of corporate funds to his personal benefit, the jury would have had no difficulty in returning guilty verdicts on Counts 1 through 53. In short, the government's evidence was compelling. This evidence may have compelled Mr. Pelul-

lo to take the stand at the first trial. However, such compulsion did not violate any right, constitutional or otherwise, of Mr. Pelullo. As the Third Circuit has held, the *Brady* material may have been useful to Mr. Pelullo with respect to the impeachment of the government witnesses regarding Count 54, but it would not have deterred Mr. Pelullo from testifying about his "entitlement" defenses. Accordingly, I have found that the government has established by clear and convincing evidence that Mr. Pelullo's testimony at the first trial was obtained by means sufficiently distinguishable from the *Brady* violation to be purged of any taint arising from that violation. *See Harrison v. United States*, 392 U.S. 219, 226, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

32. I find that the government has established by clear and convincing evidence that Mr. Pelullo would have specifically testified during the first trial that he was present at Mr. Scarfo's Florida residence even if the *Brady* material had been disclosed. I have found that Mr. Pelullo waived his fifth amendment privilege and testified at the first trial to put forth his so-called "entitlement" defense to all counts of the indictment. However, having elected to waive his fifth amendment privilege to testify about his "entitlement" defense, Mr. Pelullo could reasonably anticipate that he would be subject to cross-examination about his contacts with Mr. Leonetti and Mr. Scarfo. Mr. Whitaker testified at the remand hearing that Mr. Pelullo acknowledged that he was in fact present at Mr. Scarfo's Florida residence. (Tr. at 64). Thus, Mr. Pelullo could not have denied being present at Mr. Scarfo's house if confronted about this matter on cross-examination, but would have had to acknowledge being at Mr. Scarfo's Florida residence. Tactically, this admission would have less impact if disclosed on direct. Moreover, Mr. Pelullo could accompany his admission with his alleged innocent explanation for his visits to Mr. Scarfo's Florida residence. A far worse scenario would have transpired if Mr. Pelullo had falsely denied being present at Mr. Scarfo's Florida residence: the government could have impeached this denial by calling Mr. Swenson as a rebuttal witness. In Sum, once Mr. Pelullo waived his fifth amendment privilege to testify about his "entitlement" defense to all counts of the indictment, it was inevitable that the truth about his visits to Mr. Scarfo's house would come out. Accordingly, the government has demonstrated by clear and convincing evidence that Mr. Pelullo's specific testimony about his trips to Mr. Scarfo's house in Florida that the government introduced at the 1995 retrial was obtained by means sufficiently distinguishable from the *Brady* violation to be purged of any taint arising from that violation. *Harrison*, 392 U.S. at 226, 88 S.Ct. 2008.

33. This Court's conclusion that Mr. Pelullo would have testified in the manner that he did at the first trial even if the *Brady* material had been disclosed is bolstered by the fact that Mr. Pelullo testified at the second trial, even though the $114,000 transaction with Mr. DiSalvo charged in Count 54 was not an issue for the jury to decide. At the second trial, Mr. Pelullo once again waived his fifth amendment privilege and testified at length regarding his "entitlement" defense to the two other fraudulent schemes. Mr. Pelullo did not testify about the $114,000 transaction at the second trial. Mr. Pelullo's conduct at the second trial is powerful and compelling evidence that his reason for waiving his fifth amendment privilege and testifying at the first trial had nothing to do with the information contained in the *Brady* material, because the information contained in the *Brady* material was relevant only to the $114,000 transaction with Mr. DiSalvo and was not relevant to the other counts about which Mr. Pelullo freely testified at considerable length. Simple logic dictates that if, as Mr. Whitaker testified, Mr. Pelullo's reason for testifying at the first trial was solely to contradict the government's witnesses regarding the $114,000 transaction with Mr. DiSalvo, then Mr. Pelullo would have had no reason to testify at the second trial when this issue was not presented to the jury. The fact that Mr. Pelullo waived his fifth amendment privilege and testified at the second trial when the $114,000 transaction was not at issue establishes beyond any doubt that Mr. Pelullo had an independent reason for testifying, totally unrelated to the

subject matter of Count 54 and the information contained in the *Brady* material.

34. The conclusion that Mr. Pelullo would have testified in the manner that he did at the first trial even if the *Brady* material had been disclosed is supported by Mr. Pelullo's prior course of conduct with respect to waiver of his fifth amendment right. The government's evidence at the remand hearing established that Mr. Pelullo has a long history of voluntarily waiving his fifth amendment privilege, as demonstrated by the following circumstances:

(A) Between 1986 and 1991, Mr. Pelullo repeatedly waived his fifth amendment privilege by testifying on numerous occasions under oath concerning the subject matter of the indictment, including: (a) his connection to Delta; (b) his personal use of loan proceeds; (c) payments to corporations controlled by Mr. Pelullo; and (d) his connection to and control of Royale. (Attachment A of government's proposed findings of fact and conclusions of law is a summary of the government's evidence pertaining to Mr. Pelullo's prior testimony, showing when Mr. Pelullo testified, the proceeding in which he testified, the subject matter of the testimony, and the relevance to the indictment and this remand hearing).

(B) Between 1986 and 1990, Mr. Pelullo voluntarily gave interviews about the subject matter of the indictment to FBI agents investigating this matter on three (3) occasions. (GX 9, 10, 11). The third interview was requested by Mr. Pelullo, was conducted in the presence of his attorney, Fred Schwartz, and with Mr. Pelullo's written consent was an on-the-record interview, that is to say, Mr. Pelullo agreed that anything he said during the interview could be used against him. *See* GX 11, page 1.

(C) On July 30, 1990, Mr. Pelullo testified in his own defense at his criminal trial in Cincinnati, Ohio for bribing a bank officer. (GX 4). On the following day, July 31, 1990, Mr. Pelullo was acquitted of all charges. (GX 5). Mr. Pelullo was represented by Glenn Whitaker.

(D) On January 25 and 26, 1993, Mr. Pelullo testified in his own defense at the second trial of this indictment. (GX 13, 14).

35. I find, based on my review of: (a) Mr. Pelullo's prior sworn testimony; (b) Mr. Pelullo's voluntary interviews with the FBI, two of which were in the presence of his attorney, Fred Schwartz; (c) Mr. Pelullo's testimony in the two trials in this criminal matter; and (d) this Court's own observations of Mr. Pelullo's demeanor and conduct, specifically his ability to control and manage his own defense; that Mr. Pelullo believed he could persuade the jury that he was telling the truth. However, after testifying in his own defense at the first and second trials and being convicted in both, it is more likely than not that Mr. Pelullo decided to try a different approach in the subsequent trials.

36. Moreover, Mr. Pelullo decided to waive his fifth amendment privilege and testify at the first trial on the advice of Mr. Whitaker. (TR. at 17.) Mr. Pelullo's choice of Mr. Whitaker to defend him in this case was understandable: less than a year earlier Mr. Whitaker had successfully defended Mr. Pelullo against a federal indictment charging him with bribery. The decision in that case to waive Mr. Pelullo's fifth amendment privilege and testify in the bribery case was obviously beneficial. I find that the acquittal Mr. Pelullo and Mr. Whitaker had recently achieved by waiving Mr. Pelullo's fifth amendment privilege in the Cincinnati trial undoubtedly bolstered Mr. Pelullo's decision to once again waive his fifth amendment privilege and testify at the first trial.

37. Based upon all of the foregoing facts, I have no hesitation in concluding that Mr. Pelullo would have testified at the first trial in the manner that he did even if the government had disclosed the *Brady* material.

38. In his testimony at the remand hearing, Mr. Whitaker stated the specific reasons why Mr. Pelullo testified at the first trial: (a) to contradict the testimony of Agents Wolverton and Leyden regarding Mr. Pelullo's statements during the June 14, 1990 interview; and (b) to contradict Mr. Leonetti's testimony regarding contacts with Mr. Pelullo. The comparison of Mr. Pelullo's trial testimony with Mr. Whitaker's testimony at

the remand establishes that Mr. Pelullo's after-the-fact explanation for waiving his fifth amendment privilege is not supported, but rather is contradicted, by the record of the first trial.

39. When pressed on cross-examination at the remand hearing, Mr. Whitaker eventually admitted that Mr. Pelullo decided to testify at the first trial, in part, so that he could tell the jury his version of what he had told Agents Wolverton and Leyden during the June 14, 1990 interview about the $114,000 transaction. (Tr. at 40). Agent Wolverton's rough notes contain the notation: "repaying intercompany debt." According to Mr. Pelullo, this notation reflects a statement made by Mr. Pelullo during the June 14, 1990 interview:

Agent Wolverton's notes indicate that Mr. Pelullo stated during the interview that the purpose of the $114,000 wire transfer was to "repay intercompany debt."

*Brief Of Appellant Leonard A. Pelullo,* U.S.C.A., 3d Cir., Nos. 95–1829; 95–1856, at 18 (Dec. 8, 1995).

40. If Mr. Pelullo waived his fifth amendment privilege so that he could tell the jury that he told the agents he used the $114,000 to "repay intercompany debt" during the June 14, 1990 interview, then one would expect that Mr. Pelullo would have testified at the first trial that he told the agents he used the $114,000 to "repay intercompany debt" during the June 14, 1990 interview.

41. At the first trial, Mr. Whitaker elicited the following testimony from Mr. Pelullo about the statement he allegedly gave to the agents during the June 14, 1990 interview:

Q: What were the circumstances of the conversation—first of all, let me ask you this. Did you ever tell them at any time that this $114,000 that was wired to your father was to be used to repay a debt to Anthony DiSalvo?

A: I did not.

Q: Okay. *What were the circumstances of the conversation?*

A: I was there with Mr. Come, Mr. Wolverton and Mr. Laden (sic). And I was going over these different transactions and what was going on. I had voluntarily gone in there to speak to them and try and straighten this out. ( . . . )

And basically I had run through all the transactions with Royale and the affiliates and at the end, the question was put to me by Mr. Laden (sic), not Mr. Wolverton, what about the 114,000, did that go to pay Tony DiSalvo? *And I said I don't remember the 114,000 going to pay Tony DiSalvo, but I do have or did have a loan with Tony DiSalvo.*

It was never a situation where I said it went to pay Tony DiSalvo, because it didn't.

GX 12 at 196–97 (emphasis added).

42. The record of the first trial establishes that when given the opportunity to testify that he told the agents he had used the $114,000 to "repay intercompany debt," Mr. Pelullo did not so testify. I find that it is inconceivable that a defendant would waive his fifth amendment privilege for the specific purpose of presenting important testimony about what he allegedly said during an interview with government agents, and then simply not present the testimony.

43. Moreover, Mr. Pelullo's sworn testimony from the first trial regarding what he allegedly told the agents during the June 14, 1990 interview is far different from his after-the-fact contention that he told the agents he used the $114,000 to "repay intercompany debt." Mr. Pelullo testified: *"I said I don't remember the 114,000 going to pay Tony DiSalvo, but I do or did have a loan with Tony DiSalvo."* GX 12 at 197. The two versions of what Mr. Pelullo supposedly told the FBI agents are irreconcilable. It is clear beyond any doubt that Mr. Pelullo could not have been motivated to waive his fifth amendment privilege during the first trial so that he could testify that he told the agents he used the $114,000 to "repay intercompany debt" during the June 14, 1990 interview because Mr. Pelullo's sworn testimony from the first trial was that he said something entirely different to the agents during the June 14, 1990 interview.

44. With respect to Mr. Leonetti's testimony concerning contacts with Mr. Pelullo, Mr. Pelullo did deny generally that Mr. Leo-

**416**

netti and Mr. Scarfo discussed the DiSalvo loan with him. *See* GX 12, at 197–200. However, Mr. Pelullo admitted he was at Mr. Scarfo's house on two occasions. Mr. Pelullo did not deny that those occasions occurred in January of 1986. Nor did Mr. Pelullo deny that he met with Mr. Scarfo and Mr. Leonetti on either or both of those occasions. Thus, as to Mr. Leonetti's testimony about his "contacts" with Mr. Pelullo at Mr. Scarfo's house in January of 1986, evidence Mr. Pelullo contends motivated him to testify, the trial testimony put forth by Mr. Pelullo to contradict Mr. Leonetti is equivocal at best.

45. Moreover, whether Mr. Pelullo met with Mr. Leonetti and Mr. Scarfo was not essential to proof of the offense charged in Count 54. Mr. Pelullo's general denial of having contacts with Mr. Leonetti and Mr. Scarfo regarding the DiSalvo loan would not contradict the government's other evidence showing Mr. Pelullo committed the fraudulent scheme charged in Count 54. The gravamen of Count 54 was that Mr. Pelullo fraudulently diverted corporate funds to his personal use. The essence of the defense Mr. Pelullo put forth in the first trial was that he was entitled to use the corporate funds for his personal benefit. As noted above, Mr. Pelullo called his father to testify that Mr. Pelullo was entitled to wire transfer the $114,000 to LRP and that the Pelullo family actually repaid Mr. DiSalvo with money from a different source. Mr. Pelullo's "entitlement" defense did not require Mr. Pelullo to contradict Mr. Leonetti's testimony about their contacts. Nor would testimony contradicting Mr. Leonetti as to whether there were contacts in January of 1986 rebut the government's other proof on this count.

46. Mr. Pelullo contends that he was motivated to take the witness stand in his first trial and articulates two reasons therefore. Yet, when we read what he actually said at the first trial, with respect to those two motivating factors, we see that the testimony was vague and ambiguous at best. It is inconceivable to me under these circumstances that Mr. Pelullo would have given up his constitutional privilege only for the purpose of providing such vague and ambiguous testimony.

47. It is significant that Mr. Whitaker's closing argument at the first trial on behalf of Mr. Pelullo does not mention Mr. Pelullo's testimony that he now claims was so important. Although Mr. Pelullo contends that he was compelled to testify so that he could contradict the Agents' testimony that Mr. Pelullo admitted to using the $114,000 to repay Mr. DiSalvo, no mention was made of that testimony in his closing arguments. Instead of attacking the credibility of the government agents, Mr. Pelullo conceded for the sake of his closing argument that the $114,000 may have been used to repay Mr. DiSalvo as the government contended. Mr. Pelullo's attorney then argued that he was nevertheless entitled to use the money for this purpose:

> They have the burden, ladies and gentlemen, for a very good reason, because we are presumed innocent until proven guilty beyond a reasonable doubt. They have to show proof beyond a reasonable doubt of *no entitlement* and there has been [no] such showing.

> Let's talk about the third scheme. The third scheme is the $114,000 wire transfer from Palm Beach Heights, a deed consolidated subsidiary of the Royale Group to an account owned by LRP, Inc., a company owned by Peter F. Pelullo. Allegedly, that money, according to the Government is being used to repay a debt to Anthony DiSalvo (sic). Again, the question is, was the transfer itself, the $114,000 wire transfer, a transfer which was wrong? And ladies and gentlemen, the Government has failed to prove that it was.

> It's undisputed that it went to LRP. Undisputed. And it's undisputed that LRP is owned by Peter F. Pelullo, Leonard Pelullo's father. It's undisputed that Peter Pelullo took that money from the account, issued checks on it. Those checks were written out for various amounts and they were cashed by Arthur Pelullo. $114,000 went into the account, $114,000 came out. It is also undisputed in this case, because there is no contrary testimony anywhere that Peter Pelullo was the driving force on this project. But for Pe-

ter Pelullo, this project could not have been completed.

Peter Pelullo *was entitled* to compensation for his work on that project. And he has testified and no one has disputed it that he received a total of a little over $300,000. And what was that made up of? It was made up of $114,000 which was wire transferred to him in February of 1986 for money that he had advanced on behalf of the corporation, *money to which he had a direct entitlement,*

Ladies and gentlemen, let's assume, let's assume that Peter Pelullo used that money to repay Tony DiSalvo (sic). Let's assume that what the Government has said is correct, and we deny it, and the evidence doesn't establish that that happened in any way, shape of (sic) form. But let's assume that he did that. You've got to ask yourself, so what? *Because again, Peter Pelullo was entitled to the money as compensation and he could use that money anyway that he wanted to use it. And if he wanted to use it to repay a debt of his son, if he wanted to use is (sic) to take to the racetrack, if he wanted to use it to give it to his family, whatever it was that he wanted to do with it, it was his business.*

Remember I asked Mr. Pelullo on the stand, questions about what happened to that money and one of the things that he said is I have never answered to anyone about the use of my money, but I will now because you're asking me. And that's the way it is. *When it's your money, when you've earned it and you're entitled to it, you don't. have to answer to anyone about it. And that's the problem with the Government's case. They have not shown a lack of entitlement to the money and without showing that lack of entitlement, their case falls. It collapses.*

Attachment B, at 150–53, (emphasis added).

48. Mr. Pelullo's *closing* argument addressed the testimony of Mr. Leonetti in the following manner:

They brought in a man named Phillip Leonetti, in this case, to try to paint a picture of Leonard pelullo (sic) having some contact with bad people. He's not charged with that. *Mr. Leonetti talked about reaching out and putting pressure and muscle on Leonard Pelullo to repay a debt. He got victimized, Mr. Pelullo got victimized by an admitted ruthless murderer. And then he has been victimized by the Government by their bringing this man before you to try to make it appear that he, Mr. Pelullo is bad because he had some contact with these people, that he borrowed money and had to pay it back.*

Attachment B, at 160, (emphasis added).

49. Mr. Pelullo's summation during the first trial about Mr. Leonetti's testimony directly contradicts Mr. Pelullo's contention at the remand hearing that he testified for the purpose of contradicting Mr. Leonetti about contacts at Mr. Scarfo's house in January of 1986. Mr. Pelullo's argument that he was "victimized" by Mr. Leonetti presumes that Mr. Leonetti had contacted Mr. Pelullo and that Mr. Pelullo was forced to repay Mr. DiSalvo because Mr. Leonetti and Mr. Scarfo intervened.

50. My conclusion that Mr. Pelullo would have testified even if the government had produced the *Brady* material and therefore his decision to testify was unrelated to the *Brady* material, is reinforced by the representations of Dennis Richard, one of Mr. Pelullo's other trial attorneys, to the court during the first trial. After Mr. Pelullo had called several defense witnesses, the court, for scheduling purposes, inquired whether Mr. Pelullo could fill the remainder of the afternoon, a Friday, with other defense witnesses, including himself if he intended to testify.[4] Mr. Richard explained that the defense intended to call one or two more witnesses before deciding whether to call Mr. Pelullo. The following colloquy occurred:

Mr. COLE: Well, I just want to be sure that we understand who—if the defendant—if he is not going to take the stand—if he is going to take the stand, he can do it this afternoon. I don't want to

---

4. The exchange occurred on June 28, 1991, on a Friday afternoon at 2:51 p.m. when Mr. Pelullo informed the court that he needed an early recess because a witness he wanted to call was unavailable until Monday.

come in here Monday morning and be told that the reason for the delay was because he is going to take the stand.

Mr. RICHARD: We have other witnesses. We have to make a decision as to whether or not the defendant will take the stand. That's a decision—

The COURT: I think you're playing games with me.

Mr. RICHARD: No, we're not playing a game, Judge. Not at all. And it depends on—*once this other testimony finishes up, one has to make a judgment whether or not it's necessary or not and that is a judgment that we have not made.*

Attachment C, at 121–22 (emphasis added).

51. On July 1, 1991, the Monday following the above sidebar, two additional defense witnesses testified before Mr. Pelullo did: Kevin Thomas (concerning mortgage documents) and John Cooney (concerning Mr. Pelullo's role as CEO). Neither of these witnesses testified about anything relating the DiSalvo loan or the $114,000 wire transfer. *See* Attachment D to Government's Proposed Findings of Fact and Conclusions of Law.

52. I find that Mr. Richard's contemporaneous representation that the decision whether Mr. Pelullo would testify depended on the testimony of the additional defense witnesses, and the fact that the testimony of these additional witnesses had no relevance to the $114,000 transaction, supports this Court's conclusion that Mr. Pelullo would have testified even if the *Brady* material had been disclosed prior to the first trial.

53. At the remand hearing, Mr. Whitaker testified that Mr. Pelullo had to testify for the following reasons:

The reference is that a $114,000 wire transfer from

the [PBH] debtor-in-possession account to LRP, Inc., was used to repay Tony DiSalvo. We felt it essential that we call Mr. Pelullo to respond to that, because quite frankly, there was no other way to deal with that issue.

In addition, we felt that we were required to respond to the testimony of Mr. Leonetti about his contacts with Mr. Pelullo, and

again, there was no one else available to deal with that, and there was no effective cross-examination material to deal with those witnesses.

(Tr. at 17).

54. Contrary to Mr. Whitaker's testimony, the record of the first trial and the remand hearing establish that Mr. Pelullo had other evidence to address the government's proof that Mr. Pelullo used the $114,000 to repay Mr. DiSalvo, which he cold have used instead of having Mr. Pelullo testifying. There was another witness to what occurred during the June 14, 1990 interview: Fred Schwartz. Mr. Schwartz was present at the interview as counsel for Mr. Pelullo. The court finds that Mr. Schwartz was subject to the court's subpoena power as of June 1991. (Tr. at 42). The court finds that calling Mr. Schwartz to testify about his observations of what Mr. Pelullo said during his interview with the agents would not constitute a waiver of an attorney-client privilege between Mr. Schwartz and Mr. Pelullo. Mr. Schwartz was no less competent to testify about what occurred during the interview than Mr. Pelullo was. Thus, Mr. Pelullo could have called Mr. Schwartz to testify about what was said during this meeting in lieu of waiving his fifth amendment privilege. Mr. Schwartz also took contemporaneous notes during the June 14, 1990 interview. *See* Attachment F of government's proposed findings of fact and conclusions of law. Again, Mr. Schwartz' notes would have been as probative of what occurred during the interview as Mr. Wolverton's rough notes or Mr. Pelullo's own recollection. In sum, Mr. Pelullo could have used the testimony or notes of Mr. Schwartz to rebut the government agents about what occurred during the June 14, 1990 interview.

55. Moreover, Mr. Pelullo did call his father to testify at the first trial that his debt to Mr. DiSalvo was repaid with money from a source other than the $114,000 wire transfer, and at a date that contradicted the government's proof. Mr. Pelullo also presented documentary evidence to support his version of how he repaid Mr. DiSalvo. Mr. Pelullo's two brothers, Arthur and Pete, were also available to testify about Mr. Pelullo's ver-

sion of how and when Mr. DiSalvo was re-paid. (Tr. at 59.) The father's testimony directly contradicted the government's proof, including the testimony of the agents and Mr. Leonetti, that Mr. Pelullo used the $11400 wire transfer of PBH funds to repay Mr. DiSalvo.

56. In light of the evidence available to, and actually used by, Mr. Pelullo to defend against Count 54 at the first trial, I find that Mr. Pelullo's contention that "he was compelled to take the stand himself" because of the "government's failure to abide by its obligation under *Brady*," see *Pelullo*, 105 F.3d at 124, is not supported, but rather is contradicted, by the record.

57. In weighing the credibility of Mr. Whitaker's testimony, I have considered the following factors: Mr. Whitaker spoke with Mr. Pelullo after the Third Circuit rendered its decision regarding the remand hearing. (Tr. at 66.) Mr. Whitaker reviewed the Third Circuit's opinion (Tr. at 15) and the *Brady* material before testifying at the remand hearing. (Tr at 31). Mr. Whitaker understood the purpose of the remand hearing. (Tr. at 15). Mr. Whitaker testified that the law firm he worked for when he represented Mr. Pelullo was still owed in excess of $100,000 in legal fees, which Mr. Whitaker hopes the firm eventually collects.

58. Mr. Whitaker testified that presenting a defense to the other 53 wire fraud counts did not factor in the decision to have Mr. Pelullo testify. (Tr. at 61, 63.) This statement was made, despite the fact that the overwhelming majority of Mr. Pelullo's testimony, and the overriding theme of Mr. Whitaker's closing argument, addressed Mr. Pelullo's "entitlement" defense to all of the wire fraud counts. Even if Mr. Pelullo successfully defended against Counts 54 and 55 by contradicting the government witnesses about the $114,000 transaction, Mr. Pelullo nevertheless faced a substantial sentence of imprisonment if convicted on Counts 1 through 53. (Tr. at 61.) I find it incredible that Mr. Pelullo would be motivated to waive his fifth amendment privilege in order to defend against one wire fraud count but would not be influenced by the possibility of being found guilty of 53 additional wire fraud

counts. The most serious allegations in the indictment involved the two schemes charging Mr. Pelullo with diverting over $2 million of Royale's loan proceeds. In contrast, Count 54, charged a scheme involving only one transaction of $114,000. In view of this, I have no doubt that Mr. Pelullo's reason for waiving his fifth amendment privilege at the first trial was to defend all charges in the indictment and not limited to defending against Count 54. In light of the testimony actually presented at the first trial and the closing argument of counsel and Mr. Pelullo's potential exposure on Counts 1 through 53, I do not accept Mr. Whitaker's testimony that presenting a defense to the other 53 wire fraud counts was not a factor in Mr. Pelullo's decision to testify at the first trial.

59. Mr. Whitaker's testimony that Mr. Pelullo waived his fifth amendment privilege so that he could contradict the testimony of Agents Wolverton and Leyden about Mr. Pelullo's inculpatory statements during the June 14, 1990 interview is directly contradicted by the record of what Mr. Pelullo actually testified to at the first trial. *See supra*, at Paragraph 21–23.

60. According to Mr. Whitaker, when Mr. Pelullo reviewed Agent Wolverton's formal report, Mr. Pelullo denied making the statement that he used the $114,000 to pay Mr. DiSalvo. (Tr. at 32). Mr. Whitaker testified that Mr. Pelullo told him that he Pelullo in fact told the agents he used the $114,000 to pay "an intercompany debt." (Tr. at 34). If that were accurate, I would think that Mr. Whitaker would have demanded to see Agent Wolverton's rough notes to determine whether the contemporaneous notes of the interview contradicted the formal report and supported Mr. Pelullo's version of what allegedly occurred during the interview. Mr. Whitaker did not do this. Rather, Mr. Whitaker filed a pretrial motion asking only that the rough notes be *preserved* so that they would be available for use at trial, if necessary. Mr. Whitaker did not request to see the rough notes after Agents Wolverton and Leyden testified.

61. Moreover, Mr. Whitaker did not even attempt to cross-examine Agent Wolverton or Agent Leyden about the statement Mr.

Pelullo contends he actually gave to the agents during the meeting. Mr. Whitaker did not need the rough notes to confront the agents about whether Mr. Pelullo had in fact told them he used the money to "repay intercompany debt" because, as Mr. Whitaker testified, Mr. Pelullo himself had told Mr. Whitaker that is what he said during the interview. *See supra,* at Paragraph 60. Mr. Whitaker's failure to even broach this subject during the cross-examination of Agents Wolverton and Leyden at the first trial raises a significant doubt that Mr. Pelullo told Mr. Whitaker before the first trial that he had made the statement "repaying intercompany debt" during his interview with the agents.

62. The same logic dictates that Mr. Whitaker would have also attempted to obtain Fred Schwartz's notes of the June 14, 1990 interview. Mr. Schwartz represented Mr. Pelullo at the interview and took notes. Presumably, if Mr. Pelullo in fact made the allegedly exculpatory statement that he used the $114,000 to repay an "intercompany debt," then Schwartz's contemporaneous notes would have been compelling corroboration of this fact. Mr. Whitaker had a significant lack of recollection at the remand hearing about this piece of evidence that could have been critical to Mr. Pelullo's defense. When asked what steps Mr. Whitaker undertook to obtain Mr. Schwartz's notes, Mr. Whitaker testified that he did not recall if he asked Mr. Schwartz for his notes. (Tr. at 45.) Mr. Whitaker admitted that he spoke with Mr. Schwartz during the first trial, but testified that he did not recall whether he asked Mr. Schwartz if he took notes during the June 14, 1990 meeting. (Tr. at 41). I find it is unlikely that Mr. Whitaker would have no recollection of attempting to obtain such a significant piece of evidence, particularly when this evidence could have been used instead of calling Mr. Pelullo to testify. A better explanation is that at the first trial that evidence simply was not significant to the defense until after the Third Circuit's *Brady* finding.

63. Mr. Whitaker's request at the time of the first trial to preserve, rather than produce, Agent Wolverton's rough notes, and his failure to recall taking steps to obtain Mr.

Schwartz's notes, cast doubt upon his current testimony that Mr. Pelullo had challenged the accuracy of Agent Wolverton's formal reports and had provided Mr. Whitaker with a different account of what Mr. Pelullo had told the agents.

64. Mr. Whitaker testified "there was no effective cross-examination material" to deal with Mr. Leonetti. In its most recent opinion, the Third Circuit agreed that the *Brady* material had "potential impeachment" value with respect to Mr. Leonetti. *Pelullo,* 105 F.3d at 123. However, the Third Circuit has also held that Mr. Pelullo had other effective impeachment material to challenge Mr. Leonetti's credibility during the first trial.

> Leonetti was subject to extensive cross-examination and impeachment. The defense attacked Leonetti's credibility by bringing to light the accounts of his murders and his desperate deals with the government in order to get out of prison sooner.

*United States v. Pelullo,* 14 F.3d at 887. In light of the impeachment material actually used by Mr. Pelullo during the first trial to attack Mr. Leonetti, Mr. Whitaker's statement that he had no effective cross-examination material without the *Brady* material is, at a minimum, an exaggeration of the circumstances Mr. Pelullo faced at the first trial.

65. Moreover, in a motion filed by Mr. Pelullo after the second trial but before the Third Circuit's *Brady* finding, Mr. Pelullo described Mr. Leonetti's trial testimony as being of "minuscule relevance." *See,* Attachment E, at pg. 2 of government's proposed findings of fact and conclusions of law. This motion is probative of the weight Mr. Pelullo actually attributed to Mr. Leonetti's testimony and the effect this testimony had upon Mr. Pelullo's decision to waive his fifth amendment privilege. This Court is unwilling to accept that a defendant would be motivated to waive his fifth amendment privilege to contradict testimony which the defendant characterizes as having "minuscule relevance," particularly when the defendant was able to describe this witness as a "ruthless murderer" based upon the evidence admitted at trial.

66. Mr. Whitaker testified that he would have used the surveillance logs to impeach Mr. Leonetti's testimony that there was a meeting at Mr. Scarfo's house in Florida with Mr. Pelullo. (Tr. at 23). However, this testimony is directly at odds with Mr. Whitaker's closing argument in the first trial where Mr. Pelullo conceded Mr. Leonetti contacted him about the DiSalvo loan. Mr. Whitaker argued that even though Mr. Leonetti "muscled" Pelullo into repaying the DiSalvo loan, Mr. Pelullo was entitled to use the $114,000 in this manner. Moreover, Mr. Whitaker acknowledged that numerous entries on the surveillance logs showing that an "unidentified white male" had entered Mr. Scarfo's house could have been a reference to anybody, including Mr. Pelullo. (Tr. at 53). As the Third Circuit recognized, the surveillance logs "would do little, if any, to undermine Mr. Leonetti's testimony that he met with Mr. Pelullo at Mr. Scarfo's residence during [January 1986] to discuss the repayment of the DiSalvo loan". *Pelullo*, 105 F.3d at 123 n. 3. In light of the "questionable" impeachment value of the surveillance logs, Mr. Whitaker's testimony that having them available before the first trial would have influenced Mr. Pelullo's decision not to waive his fifth amendment privilege is not persuasive.

67. I do not believe that Mr. Leonetti's testimony about his contact with Mr. Pelullo had any effect upon Leonard Pelullo's decision to testify. Mr. Whitaker testified that Mr. Pelullo told him he was not present at Scarfo's Florida residence in January 1986, as Mr. Leonetti testified, but went there at a difference time. Mr. Pelullo's testimony fails to state when he in fact was there. I do not believe that Mr. Pelullo would waive his fifth amendment privilege so that he could contradict Mr. Leonetti's testimony only to present equivocal testimony which did not directly contradict Mr. Leonetti. Mr. Pelullo's primary theory of defense was that he was entitled to spend the $114,000 to repay DiSalvo or for any other purpose. Mr. Pelullo offered evidence to support a jury finding that he repaid DiSalvo with money from another source, whether Mr. Pelullo had contact with Mr. Leonetti was really not that significant. The question was whether or not Mr. Pelullo used corporate funds to which he was not entitled.

68. The record of the first trial established a more plausible explanation as to why Mr. Pelullo testified as he did with respect to the $114,000 wire transfer. The government has produced other evidence to establish the existence of the DiSalvo loan (Vosbikian, Arthur Pelullo); the timing of the repayment to DiSalvo (McDonald, Arthur Pelullo); and Mr. Pelullo's admission that he used the $114,000 to repay DiSalvo (Wolverton, Leyden). It was beyond dispute that Mr. Pelullo wire transferred $114,000 from a bankrupt Royale subsidiary to a Philadelphia account on February 25, 1986. Accordingly, it is beyond question that Mr. Pelullo's reason for testifying was to offer an innocent explanation as to why he was entitled to the money—irrespective of what he did with the money. It would be of no consequence to this defense whether Mr. Pelullo ever met with Mr. Leonetti over the DiSalvo loan. (In fact, Mr. Pelullo acknowledged in his trial testimony that Mr. Leonetti had contacted Mr. Pelullo's brother, Peter, about the DiSalvo loan. *See* GX 12 at 198.)

69. The record of this criminal case is replete with irreconcilable inconsistencies from Mr. Pelullo. Mr. Pelullo gave one version, under oath at the first trial, of what he allegedly told the agents during the June 14, 1990 interview. *See* Paragraph 43. Mr. Pelullo then advanced a different version of what he allegedly told the agents during the June 14, 1990 interview to persuade the Court of Appeal that he had been denied *Brady* evidence. *See* Paragraph 41. One of Mr. Pelullo's attorneys represented to this Court during the first trial that Mr. Pelullo's decision to testify depended on two witnesses who testified exclusively about the scheme charged in Counts 1 through 53. *See* Paragraphs 53–55. Another Pelullo attorney then testified at the remand hearing that Counts 1 through 53 had nothing to do with Mr. Pelullo's decision to testify at the first trial. *See* Paragraph 13. In a motion filed with this Court, Mr. Pelullo described Mr. Leonetti's trial testimony as having "minuscule relevance." *See* Paragraph 65. Mr. Pelullo then sought to establish at the remand hearing

that this "irrelevant" testimony compelled him to waive his fifth amendment privilege.

### CONCLUSIONS OF LAW

1. The government is required to prove by a preponderance of the evidence that Leonard Pelullo would have testified at the first trial even if the *Brady* material had been supplied to him.

■ 2. The government has proven by clear and convincing evidence that Mr. Pelullo would have testified during his first trial even if the withheld material had been made available to him. I therefore find that Mr. Pelullo's trial testimony from the first trial was not tainted by the *Brady* violation found by the Third Circuit in *United States v. Pelullo*, 105 F.3d 117 (3d Cir.1997) and is not subject to suppression under the exclusionary rule of *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

I therefore make the following Order:

### ORDER

AND NOW, this 9th day of June, 1998, the Defendant's Motion for a New Trial is DENIED.