

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-23-1999

# USA v. Pelullo

Precedential or Non-Precedential:

Docket 98-1527

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA v. Pelullo" (1999). *1999 Decisions*. Paper 72.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/72

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 18, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-1527

UNITED STATES OF AMERICA

v.

LEONARD A. PELULLO,
Appellant

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Crim. No. 91-cr-00060)
District Judge: Honorable Robert F. Kelly

Argued: January 27, 1999

Before: BECKER, Chief Judge, SCIRICA, and ROSENN,
Circuit Judges.

(Filed March 18, 1999)

        W. NEIL EGGLESTON, ESQUIRE
        RICHARD A. RIPLEY, ESQUIRE
         (ARGUED)
        EVAN J. WERBEL, ESQUIRE
        JULIE K. BROF, ESQUIRE
        JEANNE-MARIE S. RAYMOND,
         ESQUIRE
        Howrey & Simon
        1299 Pennsylvania Avenue, NW
        Washington, DC 20004

        Attorneys for Appellant
        Leonard A. Pelullo

MICHAEL R. STILES, ESQUIRE
United States Attorney
ROBERT E. COURTNEY, III,
 ESQUIRE
Assistant United States Attorney
Chief, Organized Crime Strike Force
WALTER S. BATTY, JR., ESQUIRE
Chief of Appeals
WILLIAM B. CARR, JR., ESQUIRE
  (ARGUED)
RONALD G. COLE, ESQUIRE
FRANK A. LABOR, III, ESQUIRE
Assistant United States Attorneys
United States Attorney's Office
615 Chestnut Street
Philadelphia, PA 19106

Attorneys for Appellee
United States of America

OPINION OF THE COURT

BECKER, Chief Judge.

I. Introduction

This appeal by defendant Leonard Pelullo, arising out of his conviction at his fourth trial in the District Court for wire fraud and civil RICO violations, brings his case before this Court for the fourth time as well. See United States v. Pelullo, 964 F.2d 193 (3d Cir. 1992) ("Pelullo I"); United States v. Pelullo, 14 F.3d 881 (3d Cir. 1994) ("Pelullo II"); United States v. Pelullo, 105 F.3d 117 (3d Cir. 1997) ("Pelullo III"). The appeal follows our remand in Pelullo III for the District Court to determine whether Pelullo would have testified at his first trial regardless of the government's Brady violations, which we identified in Pelullo II and Pelullo III. In remanding, we did not decide the quantum of the government's burden of proving that fact. The District Court concluded the burden was a preponderance of the evidence, though it went on to find by clear and convincing

2

evidence that the government's Brady violation did not cause Pelullo to testify. See United States v. Pelullo, 6 F. Supp. 2d 403 (E.D. Pa. 1998).

We devote our attention in this appeal to two issues. First, we consider whether the District Court applied the correct standard of proof. Second, if the District Court applied the correct standard, we must decide whether it erred in concluding that the government successfully met its burden. We agree with the District Court that the proper standard of proof is preponderance of the evidence and that the government met this standard at the evidentiary hearing. Accordingly, we will affirm on these points. We dispose summarily of Pelullo's remaining contentions: (i) that the District Court should have recused itself; and (ii) that the District Court erred in changing Pelullo's sentence from two-year suspended sentences on forty-eight counts following the first trial to four-year active sentences on those counts following the fourth trial, finding these contentions patently lacking in merit.1  However, the government does not counter Pelullo's contention that the District Court erred in modifying Pelullo's sentence from a non-committed fine to a committed fine withoutfinding that he had the present ability to pay the fine. We agree. Therefore, when the mandate is returned to the District Court, the District Court shall amend the judgment to reflect that the fine is a non-committed fine.

II. Facts and Procedural History

The facts in this case have been set forth in detail in previous opinions, and hence we only set forth those facts necessary to decide the narrow issues before us. In 1991, Pelullo was indicted on 54 counts of wire fraud and one RICO count. The government alleged in Counts 1–53 that Pelullo, the CEO of a public company called Royale Group,

_____

1. With regard to the latter point, we note that because we are affirming Pelullo's conviction on Counts 1 and 55, which amount to a twenty-four year sentence, and because the District Court designated the four-year sentences to run concurrently with Counts 1 and 55, the change in the sentence has no practical effect on the time Pelullo will serve, as Pelullo
now concedes.

engaged in two schemes to divert for his personal use money loaned to Royale that was to be used to refurbish several art deco hotels it owned in Miami. In Count 54 of the indictment, the government alleged a third, similar scheme: that Pelullo had diverted $114,000 from a Royale subsidiary to pay off part of a $250,000 loan that Anthony DiSalvo, a loan shark with purported ties to the Philadelphia Mafia, had made to him. The government's theory was that Pelullo submitted false documentation, including fabricated financing requests, that allowed Royale to obtain loan money in excess of the expenses it actually incurred and that Pelullo, as CEO, diverted the excess funds for his personal use.

The government's case against Pelullo on Count 54 was based primarily on the testimony of two FBI agents, Randal Wolverton and Michael Leyden, and of an admitted mafia underboss named Philip Leonetti. Wolverton testified that Pelullo, in a June 14, 1990, interview with FBI agents (including Wolverton and Leyden), had admitted using the $114,000 to pay off DiSalvo. Leonetti testified that he met with Pelullo in January 1986 at the Florida home of Nicodemo Scarfo, who was Leonetti's uncle and the reputed boss of the Philadelphia mob, to tell Pelullo that he had to repay DiSalvo. In late February 1986, Pelullo wired $114,000 from a business bank account to his father's company (LRP, Inc.) in Philadelphia. One of Pelullo's brothers (Arthur) allegedly converted the wire transfer to cash and gave the cash to their other brother (Peter) to drop off at DiSalvo's home in Philadelphia.

In response to this testimony, Pelullo took the stand and contradicted Wolverton's claim that Pelullo had admitted to using Royale funds to repay his DiSalvo debt. He claimed that he had not started to pay off the DiSalvo loan until August 1986 and that the $114,000 in question had been used to repay an intercompany debt in February. The jury, apparently unconvinced by that defense, convicted Pelullo of Count 54, 48 other counts of wire fraud, and the RICO count. We vacated this conviction as to every count but Count 54, which we affirmed. See Pelullo I, 964 F.2d at 222. We vacated the other convictions because the government had failed to authenticate bank records.

4

The government subsequently corrected the error, and in 1993, Pelullo was retried and convicted on all counts. Again, we vacated the entire conviction and remanded for retrial. See Pelullo II, 14 F.3d at 907. We concluded that the District Court had erred in instructing the jury that Pelullo's previous conviction on Count 54 conclusively established a RICO violation. See id. at 897. We also noted that the government had committed a Brady violation by failing to turn over an IRS memorandum detailing a meeting between IRS Agent James Kurtz and Leonetti, but we concluded that this violation did not affect the trial's outcome. See id. at 887.

Prior to the third trial, the government gave Pelullo three more pieces of Brady evidence. The first piece was Wolverton's rough notes of the June 14, 1990, interview during which Pelullo discussed the $114,000 transaction. The notes included the words, "repaying intercompany debt." That statement appeared nowhere in the FBI's 302 report, although it ostensibly corroborated Pelullo's defense. The second piece of Brady material was rough notes of Agent Kurtz's interview with Leonetti. Those notes referenced "summer 1986," although that date was not included in Kurtz's final memo. The third piece of material was the FBI surveillance log of Nicodemo Scarfo's Florida residence for January 1986. These logs do not list Pelullo as a visitor to the residence during that month.

In his first two trials, Pelullo had taken the stand, but in his 1994 and 1995 trials he did not. In his 1994 trial, the District Court was forced to declare a mistrial when the jury failed to reach a verdict. In his fourth trial, although Pelullo did not testify in person, the government read a portion of his testimony from the first trial into the record. At the end of the fourth trial, in early 1995, the jury convicted Pelullo on 46 wire fraud counts and the RICO violation.

Pelullo appealed from the judgment in the fourth trial, challenging his convictions on the 46 wire fraud counts and the RICO count, his sentence on those counts, and his earlier conviction on Count 54. With regard to his convictions following the fourth trial, Pelullo claimed that he had been forced to take the stand at the first trial solely

5

because the government had violated his constitutional rights by failing to meet its Brady obligation. Without the subsequently-revealed Brady evidence in hand, Pelullo argued, he had no other way to impeach the three government witnesses. He alleged that his testimony in the first trial was essentially "fruit from a poisonous tree" and that his testimony, read into the record at the fourth trial, tainted the fourth trial as well.

We agreed that there had been a Brady violation relating to Count 54[2] but remanded to the District Court for an evidentiary hearing. See Pelullo III, 105 F.3d at 125. Inter alia, we held that the District Court had erred in allocating to Pelullo the burden of proof on the Brady issue and gave the government the opportunity to establish, in accordance with Harrison v. United States, 392 U.S. 219 (1968), that Pelullo would have testified in his first trial even if the government had complied with its Brady obligations. See Pelullo III, 105 F.3d at 126. If the government were unable to prove that Pelullo's testimony in his first trial was not prompted by its Brady violation, it would be problematic for the government to have used his testimony from the first trial as evidence in the fourth trial. In other words, the government had to prove that Pelullo's decision to testify at the first trial was not caused by the Brady violation. On remand, the District Court held a hearing and made 69 findings of fact based on the evidence from the hearing, its review of the records of the first two trials, its observation of Pelullo's demeanor at all four trials, and its analysis of Pelullo's attorney's testimony about strategy at the first trial. It concluded that the government met its burden by clear and convincing evidence (i.e., by more than a preponderance). Pelullo appeals from this decision.

The District Court's legal determination of the government's requisite standard of proof is subject to de novo review. See Polselli v. Nationwide Mutual Fire Ins. Co., 23 F.3d 747, 750 (3d Cir. 1994). We review its factual findings about the effect of the Brady material on Pelullo's

_____

2. Accordingly, we reversed Pelullo's conviction from the first trial on Count 54, and that Count is not presently before us. See 105 F.3d at 127.

6

trial strategy for clear error. See Maine v. Taylor, 477 U.S. 131, 145 (1986); Campbell v. United States, 373 U.S. 487, 493 (1963). A finding is " `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite andfirm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. See Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985). Our review of the sufficiency of the district court's findings of fact on the sentencing issue is plenary. See United States v. Seale, 20 F.3d 1279, 1284 (3d Cir. 1994).

III. Discussion

A. Standard of Proof

We must first decide whether the District Court correctly required the government to meet its evidentiary burden by only a preponderance of the evidence or whether, as Pelullo urges, the Court should have required the government to prove beyond a reasonable doubt that Pelullo would have testified at his first trial even if he possessed all of the later-disclosed Brady material. While we made clear in Pelullo III that a defendant's testimony may be subject to suppression if compelled by a Brady violation, we did not direct the District Court to apply a particular standard of proof when we remanded for the evidentiary hearing. Instead, we stated:

> [B]ecause the district court misallocated the burden of proof under Harrison [v. United States, 392 U.S. 219 (1968)], we vacate the district court's denial of Pelullo's Rule 33 motion for a new trial and remand for a new hearing on that motion consistent with this opinion. On remand, the government should be afforded an opportunity to demonstrate, consistent with its burden of proof, that Pelullo would have testified during his first trial even if the withheld material had been turned over.

7

Pelullo III, 105 F.3d at 126.

As instructed, the District Court looked to Harrison for guidance. In Harrison, the Supreme Court decided that a defendant's trial testimony must be excluded if that testimony is "impelled by the prosecution's wrongful use of his illegally obtained confessions." 392 U.S. at 224. In allocating the burden of proof, the Supreme Court reasoned, "Having `released the spring' by using the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony." Id. at 225. The Court did not, however, articulate what standard of proof applies to the government's burden.

At the evidentiary hearing, the government argued--and the District Court implicitly accepted--that Harrison was an exclusionary rule case and that the proper standard under such an inquiry is a preponderance of the evidence standard. The Court reasoned that the Supreme Court has applied a preponderance standard when the government has the burden of showing that evidence is not tainted by, or did not flow directly from, a constitutional violation and is therefore not subject to suppression under the exclusionary rule. Pelullo disputes the characterization of Harrison as an exclusionary rule case, contending that the government should face a "beyond a reasonable doubt" standard because Harrison cites Chapman v. California, 386 U.S. 18 (1966), which held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. As will be discussed below, Pelullo misunderstands the import of Harrison and the nature of the evidentiary hearing at issue in this case.

The exclusionary rule mandates that evidence derived from constitutional violations may not be used at trial because illegally derived evidence is considered "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). The Supreme Court in Wong Sun explained that it is important to determine whether the derived evidence came directly from the exploitation of the constitutional violation or whether the derived evidence was obtained "by means sufficiently distinguishable to be

8

purged of the primary taint." Id. at 488. The exclusionary rule serves to deter constitutional violations by denying the government the benefit of those violations, and accordingly, "the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." Segura v. United States, 468 U.S. 796, 804 (1984).

Courts have developed a number of exceptions to the exclusionary rule, including the independent source, inevitable discovery, and attenuation doctrines, and a good faith exception. See, e.g., Segura, 468 U.S. at 805 (independent source); Nix v. Williams, 467 U.S. 431, 441–44 (1984) (inevitable discovery); Nardone v. United States, 308 U.S. 338, 341 (1939) (attenuation); Arizona v. Evans, 514 U.S. 1, 14 (1995) (good faith). The independent source, inevitable discovery, and attenuation doctrines recognize that where the causal link between the constitutional violation and later-revealed evidence is tenuous or, indeed, non-existent, the later-revealed evidence can be said to be untarnished by the constitutional violation and therefore may be admissible.

The Harrison Court recognized the importance of examining that causal link to determine whether the government's use of a defendant's illegal confession at trial induced the defendant to take the stand to testify and, in doing so, make a number of admissions that might not have come out but for that testimony. See Harrison, 392 U.S. at 224–25. While acknowledging that a number of factors inevitably play a part in a defendant's decision to testify, the Court concluded that the government had failed to prove that the defendant's testimony was obtained by means sufficiently distinguishable from the underlying constitutional violation. See id. at 225–26. We believe the Court in Harrison mandated what is essentially an exclusionary rule inquiry where there appears to be a link between a constitutional violation and a defendant's subsequent decision to take the stand.

Pelullo presses a "beyond a reasonable doubt" standard on us, based on Harrison's citations to Chapman.3 The

_____

3. Pelullo also makes much of the fact that Harrison cited People v. Spencer, 424 P.2d 715 (Cal. 1967). See Harrison, 392 U.S. at 225 n.12.

Chapman Court observed that as "the beneficiary of a constitutional error," the state must prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman, 385 U.S. at 24. This language has become commonplace in harmless error analyses. However, the issue in Harrison, and indeed at the evidentiary hearing, was whether the defendant's trial testimony was corrupted by an earlier constitutional violation; at no point had it been determined that the trial testimony itself was a constitutional violation to which a harmless error analysis might be applied. Critically, the inquiry in Harrison was a causation inquiry, not an inquiry into the effect of a constitutional violation on the verdict.

In light of Harrison's exclusionary rule framework, and by virtue of the fact that Harrison did not explicitly set out the government's standard of proof, we look to other exclusionary rule cases for guidance on the proper standard of proof. Courts almost invariably have required the government to prove only by a preponderance of the evidence that the causal link between the constitutional violation and the later-revealed evidence is sufficiently weak or remote to merit admission of that evidence. For example, in Nix, the Supreme Court determined that the government must prove by a preponderance that the police would have inevitably discovered the victim's body without the help of an illegally obtained confession. See Nix, 467 U.S. at 444 n.5. The Court was unwilling to impose a higher standard of proof because a higher standard would impose "added burdens on the already difficult task of proving guilt in criminal cases by enlarging the barrier to placing evidence of unquestioned truth before juries." See id.; see generally United States v. Matlock, 415 U.S. 164, 177 n.14 (1974)

_____

In Spencer, the Supreme Court of California held that the government had to prove beyond a reasonable doubt that the defendant did not take the stand as a result of the government's use of an improper confession in court. See 424 P.2d at 724. But the Harrison Court gave no indication that it wished to adopt Spencer's standard of proof analysis, citing Spencer only for the proposition that the government bears the burden of disproving causation. We refuse to read more into the Court's decision to cite Spencer.

("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."); Lego v. Twomey, 404 U.S. 477, 488 (1972) ("[N]o substantial evidence has accumulated that federal rights have suffered from determining admissibility by a preponderance of the evidence.").

Lower courts have followed the Supreme Court's lead, expanding the preponderance standard to the independent source doctrine and attenuation cases. The Tenth Circuit in United States v. Lin Lyn Trading, Ltd., 149 F.3d 1112, 1116 (10th Cir. 1998), held that the government had to prove by a preponderance that the evidence in question came from an independent source or that the discovery of the evidence was so attenuated from the constitutional violation as to escape the violation's taint. Likewise, in United States v. Dudden, 65 F.3d 1461 (9th Cir. 1995), the Ninth Circuit concluded that if the government wished to use evidence against a defendant to whom it had granted statutory immunity without violating the Fifth Amendment, it had to prove by a preponderance that it had obtained that evidence from a source independent from the defendant's own testimony. See id. at 1468; see also United States v. Vasquez De Reyes, 149 F.3d 192, 195 (3d Cir. 1998) (requiring government to prove inevitable discovery by a preponderance);4 United States v. Griffin, 48 F.3d 1147,

_____

4. In Vasquez, we expressed concern about applying the inevitable discovery exception to testimonial evidence. However, in Vasquez, the defendant was illegally stopped by an INS agent who suspected that she was an illegal alien. After producing papers showing that she was married to a resident of the Virgin Islands, but after failing to show a visa, she was taken to a correctional facility. Her husband arrived at the facility and, after being questioned, revealed that their marriage was a sham. As a result, Mrs. Vasquez De Reyes confessed to the sham. She later filed a motion to suppress her statement based on the illegal nature of the original stop, but the district court found that the sham nature of the marriage would have inevitably been discovered through an INS investigation of her marriage when she applied to live in the U.S. On appeal, Vasquez De Reyes argued that there were too many variables to find that a routine INS investigation would have inevitably disclosed the sham. We agreed, noting that the statement that the government sought

11

1151 (10th Cir. 1995) (requiring government to prove by a preponderance its independent source and inevitable discovery theories); United States v. Bartel, 19 F.3d 1105, 1112 (6th Cir. 1994) (requiring proof of independent source by preponderance).

The purpose of the evidentiary hearing in the District Court was much like an exclusionary rule inquiry in which the government argues that it would have obtained the evidence anyway under the inevitable discovery or independent source doctrines. The government was given the chance to prove that Pelullo would have testified at the first trial––and the government would have thus "obtained" his testimony therefrom––even if Pelullo possessed all of the Brady material before the first trial. For the foregoing reasons, we agree with the District Court's conclusion that the government had to meet its burden by a preponderance of the evidence.

B. The Government's Proof

In light of our conclusion that the District Court held the government to the correct standard of proof at the evidentiary hearing, we must decide whether the District Court clearly erred in finding that the government had met its burden at the hearing. We hold that the District Court did not clearly err in concluding that the government established by a preponderance "that Pelullo's testimony at the first trial was obtained by means sufficiently distinguishable from the Brady violation to be purged of any taint arising from that violation." See Pelullo, 6 F. Supp. 2d at 413. We first review the general scheme of Count 54 and then address in detail the seven factual findings explicitly contested by Pelullo.

_____

to have admitted under the exception was a "statement not yet made," which by nature is not capable of ready verification. 149 F.3d at 195–96. In Pelullo's case, however, the issue is not what Pelullo would or would not have testified to, which clearly would require speculation, but whether he would have testified, which is a less speculative and more easily verifiable determination.

12

Count 54 of the indictment was based on a wire transfer made on February 26, 1986. Pelullo transferred $114,000 from the account of Palm Beach Heights, a Royale subsidiary, to LRP, Inc., a company owned by Pelullo's father. The government alleged that Pelullo performed the wire transfer and used the transferred corporate funds to repay the money he had borrowed from DiSalvo.

As proof of this diversion for personal use, the government relied first on Leonetti's testimony and IRS Agent Kurtz's notes from an interview with Leonetti. Leonetti testified that at the end of December 1985, DiSalvo asked him to help collect DiSalvo's loan to Pelullo. Leonetti then stated that he told Scarfo, his "boss," about DiSalvo's request, whereupon they contacted Pelullo in Florida. Leonetti testified that Pelullo came to Scarfo's house in Florida in January 1986, at which time they pressured him to repay the DiSalvo loan.[5] The government sought to connect the timing of this meeting with the February wire transfer. The government also relied on Agents Wolverton's and Leyden's testimony. Both agents testified that Pelullo admitted, during the June 1990 interview with them, that he had used the $114,000 belonging to Palm Beach Heights to repay the DiSalvo debt.

During his testimony about Count 54 at the first trial, Pelullo admitted that DiSalvo had lent him money, but denied that the $114,000 had been used to repay DiSalvo, or that he had told the agents that it had. Pelullo also denied ever meeting Leonetti, although he acknowledged that he knew who Leonetti was. He admitted going to Scarfo's house, but claimed that he went there to consult with a friend who was doing construction for Scarfo. Finally, Pelullo testified that he only began to repay the DiSalvo debt in August or September 1986, and that the loan was not fully paid off until 1987. The District Court made 69 findings of fact; we discuss only the seven contested findings, which provide the primary rationales for

_____

5. The third piece of Brady material, the FBI surveillance logs of Scarfo's
house, did not list Pelullo as a visitor to the house in January. However, the logs only covered twelve days in January, see Pelullo III, 105 F.3d at 123 n.3, and thus appear to be of little help to Pelullo's case.

13

the District Court's conclusion that Pelullo would have testified even in the absence of a Brady violation.

## 1. Propensity to Testify

The District Court concluded that Pelullo's prior course of conduct established "a long history of voluntarily waiving his fifth amendment privilege." See United States v. Pelullo, 6 F. Supp. 2d 403, 414 (E.D. Pa. 1998). The Court referred to a number of instances in which Pelullo had testified under oath or had voluntarily given interviews to the FBI about the subject matter of various indictments, including this one. While we are hesitant to conclude that someone has a "propensity" to testify, the District Court draws a number of valid inferences. From the situations in which Pelullo had waived his Fifth Amendment privilege, including an example where Pelullo testified and was acquitted, the Court inferred that "Mr. Pelullo believed he could persuade the jury that he was telling the truth." See id. The District Court also hypothesized that after testifying in his own defense in the first two trials and being convicted both times, Pelullo may have decided to change tactics in the third trial. See id. Pelullo tries to refute this conclusion by arguing that his behavior in the third and fourth trials (i.e., his decision not to testify there) shows that he does not have a propensity to testify. However, this is an area in which we will defer to the District Court, which has observed Pelullo's demeanor and conduct over the course of seven years.

## 2. Entitlement Defense

At the evidentiary hearing, the government attempted to show that Pelullo's entire defense--to each of the three discrete schemes that underlay the various counts--was a defense of entitlement; that is, Pelullo's response to the government's accusation that he had embezzled money was that he was entitled to the money. If the government succeeded in showing that Pelullo needed to testify about each scheme in order to proffer his entitlement defense, then it would be clear that the Brady information was neither especially useful to Pelullo nor relevant to his

14

decision to testify. The District Court, adopting the government's theory, placed great weight on this factor. Specifically, it stated:

> I find that the government has established by clear and convincing evidence that Mr. Pelullo waived his fifth amendment privilege and voluntarily agreed to testify at the first trial so that Mr. Pelullo could present a defense to the jury by explaining that he was entitled to use the Royale corporate funds in the manner that he did, and therefore, he did not commit fraud as charged in the indictment. I further find that the Brady material does not and cannot establish or even support the `entitlement' defense Mr. Pelullo sought to establish through his direct testimony.

6 F. Supp. 2d at 412; see also id. at 421.

In response, Pelullo points to trials three and four. If it really were necessary for him personally to take the stand to present his entitlement defense, Pelullo argues, then he would have had to testify in the third and fourth trials. Noting that the government's case on Counts 1-53 did not materially change throughout the four trials, Pelullo submits that his silence in the third and fourth trials shows that he had no need to take the stand in his own defense once he had the Brady material.

While this is a compelling argument, we cannot hold that it was clearly erroneous for the District Court to give weight to Pelullo's defense strategy in his first two trials. The reason Pelullo did not testify in the third trial was most likely a combination of factors: his testimony in the first and second trials had not convinced the jury; his attorney felt that Pelullo could set forth his entitlement defense well enough using just his father's (and others') testimony; and the Brady material gave extra support to his defense. That is, it is highly probable that Pelullo learned certain things about his case as the first two trials played out, and that some of that knowledge played a role in his decision not to testify at the third trial. While the District Court did not make specific findings about Pelullo's defense strategy at his third trial, we cannot conclude that it was clearly erroneous to give weight to Pelullo's strategy in the first

15

trial, even though that strategy had obviously changed slightly by the third trial.

3. Counts 1-53

The District Court found that each count of wire fraud would expose Pelullo to five years imprisonment; that Scheme One alleged that Pelullo diverted $1.6 million in loan proceeds; that Scheme Two alleged that Pelullo diverted $471,000 of corporate funds; but that Scheme Three (which encompassed Count 54 only) alleged a diversion of $114,000. See 6 F. Supp. 2d at 409. The District Court also noted that the government had a strong case against Pelullo on Counts 1-53; the prosecution introduced approximately thirty witnesses, in addition to voluminous documentary evidence, to prove Pelullo's guilt on those counts. See id. Highlighting the fact that only six of Pelullo's 116 pages of direct testimony related to Count 54, the Court concluded, "[T]he vast majority of Mr. Pelullo's testimony was dedicated to providing a defense to the heart of the government's case, namely the two fraudulent schemes charging Mr. Pelullo with defrauding [his companies] of over $2 million." See id. at 411.

In sum, the District Court found that the government clearly established that Pelullo had stonewalled Royale's accountants to conceal his diversion of corporate funds, and that absent an explanation justifying that diversion, the jury would easily have returned guilty verdicts on Counts 1-53. See id. at 412. In light of this finding, the Court concluded that the Brady material would not have deterred Pelullo from testifying about his entitlement defenses to the weightier charges of diversion in Counts 1-53. Therefore, the Court found, Pelullo's testimony at the first trial was "obtained by means sufficiently distinguishable from the Brady violation to be purged of any taint arising from that violation." See id. at 413. The Court then inferred that Pelullo, having decided to testify about Counts 1-53, knew he would be subject to cross-examination about Count 54 and testified about Count 54 issues on direct examination to diffuse their potency. See id.

16

The Court drew support for its conclusion from another situation at the first trial. Well into the first trial, one of Pelullo's attorneys, Dennis Richard, told the Court that the defense would call two more witnesses before it decided whether to put Pelullo on the stand. After calling those two witnesses, neither of whom testified about anything related to the DiSalvo loan or the $114,000 wire transfer, the defense decided to call Pelullo as a witness. The District Court found that this decision supported the government's position that Pelullo would have testified even if the Brady material had been disclosed. See id. at 417–18. The Court apparently reasoned that the decision whether to call Pelullo hung on what those two witnesses managed to convey; that the defense knew at that point that those witnesses would have nothing to say about the $114,000; and that Pelullo had to take the stand to convey additional information that the two witnesses had not imparted, information unrelated to the DiSalvo loan. See id. at 418. While this is not the only inference that the District Court could have drawn from these facts, it is a viable inference, and thus we cannot find clear error.

4. Whitaker

Although Pelullo did not bear the burden of proving the causal connection between the Brady violation and his testimony, he nevertheless introduced the testimony of Glenn Whitaker, his attorney from the first trial. Whitaker testified as follows:

> Q: What were the determining factors in that decis ion to have [Pelullo] testify [at the first trial]?
>
> W: Well, primarily that we had two F.B.I. agents testifying about a meeting at which Mr. Pelullo was present, and their testimony needed to be rebutted about a particular reference that's contained in this 302 [report] . . . .
>
> Q: Is that the reference that is at Page JA-774, t he last four lines?
>
> W: Yes. The reference is that a $114,000 wire tran sfer from the debtor-in-possession account to LRP, Inc.,

17

was used to repay Tony DiSalvo. We felt it essential that we call Mr. Pelullo to respond to that, because, quite frankly, there was no other way to deal with that issue. In addition, we felt that we were required to respond to the testimony of Mr. Leonetti about his contacts with Mr. Pelullo, and, again, there was no one else available to deal with that, and there was no effective cross-examination material to deal with those witnesses.

6 F. Supp. 2d at 408. Whitaker further stated that Pelullo was put on the stand to deny that he made the statement alleged in the 302 report and to deny that he had had direct contact with Leonetti. See id. at 408-09. In addition, Whitaker noted that he felt that they had "adequate defenses and adequate presentation as to the other counts. Count 54 was the one [they were] most concerned about." See id. at 409.

The Court considered five factors in weighing Whitaker's credibility: (i) Whitaker spoke with Pelullo after we remanded for an evidentiary hearing; (ii) Whitaker reviewed our opinion in Pelullo III; (iii) Whitaker reviewed the Brady material before testifying at the evidentiary hearing; (iv) Whitaker understood the purpose of the remand hearing; and (v) Whitaker testified that the law firm he worked for when he represented Pelullo was owed over $100,000 in legal fees. See id. at 419. Coupled with the Court's incredulity that, counter to Whitaker's testimony, Pelullo would not have defended himself against Counts 1-53 in person using his entitlement defense, the Court found these factors rendered Whitaker's testimony unbelievable. However, as Pelullo points out on appeal, most prepared witnesses would meet factors (i)-(iv). It is also doubtful that Whitaker would feel an obligation to help his oldfirm obtain outstanding fees. Had the District Court relied on factors (i)-(v) alone in questioning Whitaker's credibility, we might well have found clear error. But the District Court made further findings about Whitaker that affect the calculus.

For instance, Whitaker's closing argument troubled the District Court. The Court observed that Whitaker's closing at the first trial did not mention the evidence Pelullo now

18

claims was the sole reason he testified. See id. at 416. In fact, in closing, Whitaker conceded for the sake of argument that the $114,000 may have been used to repay DiSalvo, as the government had contended. Whitaker then argued that Pelullo was nevertheless entitled to use the money for that purpose:

> [L]et's assume that Peter Pelullo used that money to repay Tony DiSalvo. Let's assume that what the Government has said is correct, and we deny it, and the evidence doesn't establish that that happened in any way, shape [or] form. But let's assume he did that. . . . Because again, Peter Pelullo was entitled to the money as compensation and he could use that money any way that he wanted to use it. And if he wanted to use it to repay a debt of his son, if he wanted to use [it] to take to the racetrack . . . whatever it was that he wanted to do with it, it was his business.

Id. at 417.

In the District Court's view, the quoted language called into question the asserted reason that Pelullo testified, since Whitaker did not mention Pelullo's testimony rebutting Leonetti and Wolverton. Second, it illustrated the importance of the entitlement defense to Pelullo's case and bolstered the District Court's conclusion that Pelullo would have testified anyway to set forth that defense.

The District Court was troubled by yet another of Whitaker's trial strategies. The Court thought that when Pelullo reviewed Wolverton's formal report and saw that the report included an "admission" that the $114,000 went to pay off DiSalvo, Whitaker should have requested Wolverton's rough notes of the interview to see whether those notes correlated with the formal report. See id. at 419. Instead, Whitaker merely filed a pretrial motion asking that the rough notes be preserved so that they would be available for use at trial. Whitaker did not ask to see the rough notes after Wolverton and Leyden testified.

The District Court found a final reason to disbelieve Whitaker. It properly noted the "questionable" impeachment value of the surveillance logs, see Pelullo III, 105 F.3d at 123 n.3 (noting that the logs only covered twelve days in

19

January), and therefore found unpersuasive Whitaker's testimony that having the logs available would have influenced Pelullo's decision to testify in thefirst trial. See id. at 421.

Pelullo strongly opposes the District Court's (and the government's) supposed intimations that Whitaker's conduct was less than impeccable and objects to their putative slur on his professional reputation. We do not find such supposed aspersions to have been made; indeed, it appears to us that Whitaker is a highly reputable (and capable) lawyer. We also acknowledge the force of Pelullo's response to the District Court's (and the government's) arguments on this point. However, taking as a whole the Court's findings about Whitaker, we cannot conclude that it clearly erred in choosing not to credit Whitaker's testimony about the reasons Pelullo testified in the first trial.[6]

5. Ambiguous Testimony at the First Trial

The District Court devoted a number of its findings to a comparison between Whitaker's testimony about why Pelullo took the stand and what Pelullo actually testified to on the stand at the first trial. Finding that Pelullo did not testify unambiguously about the things he had purportedly planned to testify to, the District Court inferred that Whitaker's testimony was not entirely believable and appeared to be an "after-the-fact" explanation of why Pelullo took the stand. See id. at 414-15.

_____

6. The District Court was mistaken when it faulted Whitaker for failing to cross-examine Wolverton and Leyden about the content of their notes. The Court concluded, "Mr. Whitaker's failure to even broach this subject during the cross-examination of Agents Wolverton and Leyden at the first trial raises a significant doubt that Mr. Pelullo told Mr. Whitaker before the first trial that he had made the statement`repaying intercompany debt' during his interview with the agents." See 6 F. Supp. 2d at 420. However, as Pelullo points out, Whitaker had nothing with which to confront the agents, in light of the Brady violation. Whitaker did cross-examine the agents on other issues, but he can hardly be faulted for believing he had nothing to cross-examine the agents with on the $114,000 question. This fact does not, however, alter our ultimate conclusion.

20

Specifically, Whitaker stated that Pelullo wanted to tell the jury his version of events; with regard to the FBI interview, the Court perceived that version to be a clear statement that Pelullo used the $114,000 to "repay company debt." But the Court found that Pelullo never explicitly offered this explanation. See id. at 415. Instead, the Court noted that Pelullo testified at trial, "I said I don't remember the $114,000 going to pay Tony DiSalvo, but I do have or did have a loan with Tony DiSalvo." See id. The Court concluded that the "two versions of what Mr. Pelullo supposedly told the FBI agents are irreconcilable." See id.

We disagree. The District Court apparently wanted Pelullo to testify verbatim about what he ostensibly told the FBI agents, but that was not within its power to require. At all events, the two versions are not irreconcilable. The District Court ignored the segment of Pelullo's testimony that came just before the above-quoted language. In response to a question about the circumstances of the February wire transfer, Pelullo stated, "That transfer was a transfer that I made to authorize to LRP for moneys that my dad was owed by the company." Since Pelullo had just testified that the February wire transfer went to pay off an intercompany debt, it is overly formalistic to require that he reiterate that point a few questions later in predetermined language. In sum, the District Court clearly erred on this set of findings, but this does not render its overall conclusion clearly erroneous.

The District Court found similar problems with Pelullo's testimony about Leonetti. While acknowledging that Pelullo denied meeting Leonetti, the Court noted that Pelullo admitted that he had been to Scarfo's house on two occasions, and that he did not deny that these visits had occurred in January 1986. The Court then faulted Pelullo for failing to deny that "he met with Mr. Scarfo and Mr. Leonetti on either or both of those occasions." See id. at 416. But Pelullo had already testified, when asked if Leonetti ever contacted him about the DiSalvo loan, that Leonetti never had contacted him. Perhaps his lawyer should have made sure to ask Pelullo whether he visited Scarfo's house in January; it appears that Pelullo did not deny that his visits to Scarfo's house were in January

21

because he was never asked when those visits occurred. The District Court declared, "It is inconceivable to me under these circumstances that Mr. Pelullo would have given up his constitutional privilege only for the purpose of providing such vague and ambiguous testimony." See id. While it would be unfair to require Pelullo to lay out his defense in specific words, we do not think the District Court erred in inferring that Pelullo would have set forth a clearer defense if he truly had decided to testify solely to rebut the government's case on Count 54.

6. Testimony in the Second Trial

At his second trial, Pelullo again testified in his own defense, setting out his entitlement theory much as he had in the first trial. The District Court found that the only significant difference between his testimony at the two trials was that he did not testify about the $114,000 in the second trial. The Court found that this was "powerful and compelling evidence that his reason for waiving his fifth amendment privilege and testifying at the first trial had nothing to do with the information contained in the Brady material, because the information contained in the Brady material was relevant only to the $114,000 transaction with Mr. DiSalvo and was not relevant to the other counts about which Mr. Pelullo freely testified." See id. at 413.

Pelullo correctly points out that the District Court had (erroneously) ruled at the beginning of the second trial that the jury would be instructed that it had to find as a matter of law that Pelullo had committed the acts set forth in Count 54. Pelullo argues that he had no choice but to take the stand in an attempt to mitigate the explosive impact of that error, though he fails to explain precisely why he felt that taking the stand to discuss Counts 1-53 would mitigate the error. Thus, he would have us conclude, the trial was so fraught with error that it cannot be used as evidence of anything.

However, with regard to trial two, either of two assumptions could be correct. While it might be true that Pelullo had to get on the stand in order to combat the District Court's erroneous use of collateral estoppel, it also

22

could be true that taking the stand when Count 54 was not in issue indicates that the role of Pelullo's testimony in his own defense encompassed more than just a response to Count 54. Since either inference is viable, we discern no clear error in the District Court's finding.

7. Pelullo's Other Evidence in Defense Against Count 54

The District Court found that Pelullo had a significant amount of evidence that he could use in mounting a defense to Count 54. This evidence included his father's testimony that Royale owed his company money for the hotel renovation project; that the $114,000 transfer in February was partial payment of that debt; that he used the $114,000 for personal reasons; and that he did not use the money to repay DiSalvo on his son's behalf. See id. at 411.

Beyond refuting the accusations against Pelullo, Pelullo's family offered an affirmative explanation for the events at issue. See id. His father testified that in August 1986, Leonard's brother Arthur told him that Leonard had borrowed money from DiSalvo and that Scarfo and Leonetti had advised the Pelullos to repay DiSalvo. Leonard's brother Peter testified that he helped Leonard repay DiSalvo by borrowing money from a bank in September 1986; Peter stated that he then gave that money to Arthur to give DiSalvo. Leonard introduced bank documents supporting this story, including a $55,000 bank check drawn on his brother's account, made payable to DiSalvo. The District Court did not clearly err in concluding that, based on this evidence list, Pelullo could have mounted a defense to Count 54 without taking the stand himself.

The Court also found that Pelullo had a number of ways to impeach Leonetti's testimony, only one of which was taking the stand. As we noted in Pelullo II, "Leonetti was subject to extensive cross-examination and impeachment. The defense attacked Leonetti's credibility by bringing to light the accounts of his murders and his desperate deals with the government in order to get out of prison sooner." Pelullo II, 14 F.3d at 887. The District Court also found that Pelullo, in a motion after the second trial, had described

23

Leonetti's trial testimony as having "minuscule relevance."
See 6 F. Supp. 2d at 420. From that language, the District
Court inferred that Leonetti's testimony had little effect on
Pelullo's decision to waive his Fifth Amendment rights.
While an alternate reading--that Pelullo simply was
downplaying to the court the significance of an adverse
witness's testimony--is possible, the District Court's
reading is plausible too.

In sum, based on the whole of the District Court's
findings of fact, we cannot say that the District Court
clearly erred when it found that the government proved by
a preponderance of the evidence that Pelullo would have
testified during his first trial even if the withheld material
had been made available to him. While the District Court's
findings of fact were not uniformly correct, we are not left
with a "definite and firm conviction that a mistake has been
committed." See United States Gypsum, 333 U.S. at 395.
The judgment of the District Court will be affirmed.
However, upon return of the mandate to the District Court,
the Court shall amend the judgment to reflect that the fine
is a non-committed fine.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

24