UNITED STATES of America

v.

Fred WOGAN.

Criminal No. 1:04–CR–0252.

United States District Court,
M.D. Pennsylvania.

Jan. 19, 2005.

Lori J. Ulrich, Federal Public Defender's Office, Harrisburg, PA, for Defendant.

Martin C. Carlson, U.S. Attorney's Office, Harrisburg, PA, for Plaintiff.

## *MEMORANDUM*

CONNER, District Judge.

The defendant, Fred Wogan, moves to suppress evidence obtained from the trunk of the vehicle that he was operating at the time of his arrest for parole violations. Police discovered the contraband soon after the arrest but did not seize the materials until after they had secured the owner's consent to search the trunk. The court finds that the initial search was not supported by probable cause and that the subsequent search was tainted by the first. The motion to suppress will be granted.

### I. *Findings of Fact*[1]

On the evening of April 30, 2004, private guards at a commercial warehouse noticed a vehicle driving around the employee parking lot. The vehicle proceeded slowly and stopped periodically. During the stops, an occupant would exit the vehicle, approach an adjacent parked car, attempt to gain entry, and then return to the vehicle. The process was repeated several

---

1. These findings are based on testimonial and documentary evidence presented at the hearing on the defendant's motion to suppress. *See infra* Part II.

times. The guards soon contacted the Police Department of Carlisle Borough, Pennsylvania, and reported the suspicious activity. (Doc. 44 at 5–10, 36–39).

Officer Eric Dale ("Officer Dale") responded in a marked police car. The guards pointed out the vehicle, which was then approaching their security station. It immediately exited the parking lot and sped away. Officer Dale pursued, and was able to stop the vehicle without further incident. The driver identified himself as Fred Wogan ("Mr.Wogan"). Officer Dale recognized him as subject to an outstanding warrant for parole violations and took him into custody. (Doc. 44 at 8–13, 39–45).

After placing the defendant in the rear seat of a police car, Officer Dale returned to speak with the passenger, Rodney Hill ("Hill"), who had remained in the vehicle. As he began questioning Hill about his purpose in the area, the officer was notified that an employee of the commercial warehouse had reported the theft of a cellular phone. Officer Dale asked Hill to exit the vehicle and retrieved a cellular phone lying on the center console of the front seat.[2] Serendipitously, the phone rang and the officer found himself speaking to the victim of the theft.[3] After promising to return the phone to its owner, Officer Dale examined the back seat of the vehicle and discovered a variety of small items, all of which could have been quickly removed from a parked car. Both Hill and the defendant denied ownership of any of these items. (Doc. 44 at 11–18, 46–50, 73–81).

Officer Dale informed Hill that the vehicle would be impounded but that, despite his apparent involvement in criminal activity, he would be released. Hill asked the officer if he could retrieve two bags from the trunk before it was towed.[4] Officer Dale agreed. He opened the trunk[5] and, after a brief search of their contents, gave the bags to Hill. (Doc. 44 at 16–20, 31–33, 50–54, 73–81).

While the trunk was open, Officer Dale noticed a third, black leather bag, which appeared to be stuffed with envelopes. Some envelopes were visible, and the officer noticed that they bore several different addresses. He asked Hill whether the bag was his; Hill said no. Without asking the defendant or making further inquiries about the bag's ownership, Officer Dale removed the bag from the trunk, placed it on the ground, and began to examine its contents. It contained dozens of envelopes, addressed to numerous individuals. He replaced the envelopes in the bag and the bag in the trunk. The car was towed

**2.** Officer Dale also noticed several credit cards on the center console, none of which bore the defendant's or Hill's name. (Doc. 44 at 11–18, 46–50, 73–81).

**3.** Several days after the suppression hearing, the government submitted a letter indicating that, contrary to his testimony, Officer Dale did not receive a call from the owner of the cellular phone during the vehicle stop. According to reports maintained by the Carlisle Police Department, Officer Dale received the owner's call later in the evening. While the court is rather astonished at this factual discrepancy, neither party has requested an opportunity to re-open or supplement the suppression proceedings; moreover, the timing of the call has no bearing on the resolution of the motion to suppress (and would indeed seem detrimental to the government's position). Therefore, the court declines to accept the letter as evidence of record. *See United States v. Fiorelli*, 337 F.3d 282, 287–88 (3d Cir.2003).

**4.** Officer Dale testified that he did not know who had placed the bags in the trunk. (Doc. 44 at 91–92).

**5.** Officer Dale had previously retrieved the keys to the vehicle from either the defendant or the ignition of the vehicle. (Doc. 44 at 73–81).

to a municipal impound lot. (Doc. 44 at 20–23, 54–57, 73–82).

Officer Dale decided to contact Grace Wogan ("Mrs.Wogan"), the defendant's eighty-two-year-old grandmother and the registered owner of the vehicle, to notify her of the impoundment. He did not speak to Mrs. Wogan on the evening of the search, but reached her daughter-in-law. The officer informed her of the defendant's arrest and the discovery of potentially stolen materials in the trunk of the vehicle. She agreed to accompany officers on the following day to Mrs. Wogan's home, where the defendant also resided, in an effort to secure Mrs. Wogan's consent to a second search of the vehicle. (Doc. 44 at 22–24, 56–61).

Officer Dale, accompanied by another member of the Carlisle Police Department, met with Mrs. Wogan at her home on the next day. Mrs. Wogan's daughter-in-law was also present. The officers recounted the circumstances of the impoundment and presented Mrs. Wogan with a form titled "voluntary search consent." The document provides as follows:

> I, _____, having been informed of my constitutional right not to have a search made of the premises and/or vehicle hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize _____, and _____, Police Officers of. CARLISLE POLICE DEPARTMENT[,] Carlisle, Pennsylvania, to conduct a search of my premises and/or vehicle located at _____[.] These officers are authorized by me to take from my premises and/or vehicle any letters, papers, materials or other property which they may desire.

This written permission is being given by me to the above named Police Officers voluntarily and without threats or promises of any kind.

(Doc. 44, Gov't Ex. 1). Mrs. Wogan said that she did not want to get her grandson "into any trouble," but nevertheless agreed to sign the paper. Officers filled in the appropriate information, and Mrs. Wogan executed the document. The officers and Mrs. Wogan's daughter-in-law served as witnesses to Mrs. Wogan's signature. (Doc. 44 at 26–29, 61–64, 96–99).

With the consent form executed, officers returned to the impounded vehicle and obtained the black leather bag. In it, they discovered numerous letters that had apparently been stolen from the federal postal system. Several of the letters were opened, and were later linked to fraudulently endorsed checks recently cashed in the area. The case was referred to a United States postal inspector and charges of mail theft and bank fraud were brought against the defendant. (Doc. 44 at 29–31, 67).

The defendant moved to suppress the contents of the bag on grounds of illegal search and seizure. The government countered that the searches were justified based on probable cause and on the consent of Mrs. Wogan. At a hearing on the matter, Officer Dale testified about these events, offering a candid assessment of the initial search and the subsequent meeting with Mrs. Wogan.[6] (Doc. 44 at 5–31). Mrs. Wogan was also offered as a witness and corroborated several aspects of his account. She related that she had not been feeling well at the time of the officers' visit, was on medications that made her "drowsy" and "foggy," and was hospitalized on the following day. She also testified that, although police had not ex-

---

**6.** Of particular note to the subject of candor is Officer Dale's testimony that he now regrets

opening the trunk of the vehicle at Hill's request. (Doc. 44 at 77–78).

plicitly pressured her, she had assumed that she had no choice but to consent to the search since the car had already been impounded. She was unable to confirm her signature on the consent form, but did not doubt that she had signed a document presented by police. (Doc. 44 at 96–98, 100–07).

## II. *Discussion*

 With limited exceptions, the Fourth Amendment's prohibition against "unreasonable searches and seizures" requires officials to obtain a warrant before searching persons or property. *See United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). A warrantless search is presumptively unreasonable, and the burden is on the government to establish by a preponderance of the evidence that the circumstances justified acting without a warrant.[7] *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970).

 Although strictly a legal issue, the constitutional reasonableness of a search is fact-specific, dependent on the individual circumstances surrounding the officers' conduct. *See Ornelas v. United States*, 517 U.S. 690, 695–98, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (citing *Ker v. California*, 374 U.S. 23, 33, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963)). It is not usually susceptible to answer-by-analogy but must be evaluated through application of the particular facts of the case to general guiding principles. *See Illinois v. Gates*, 462 U.S. 213, 231–32, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Every search is, in essence, *sui generis*.

The nature of this analysis requires the court to consider separately the two searches by officers in this case. The first was conducted immediately after the defendant's arrest, when Officer Dale opened the trunk at Hill's request. The second was conducted the following day, after Mrs. Wogan had executed the consent form. If either of the searches was valid, then the motion to suppress must be denied.

### A. *Search Following the Arrest*

 Officers are presumptively entitled to conduct a full search of an automobile following the arrest of the driver. *Thornton v. United States*, 541 U.S. 615, 124 S.Ct. 2127, 2130–31, 158 L.Ed.2d 905 (2004).[8] The search may extend throughout the entire passenger compartment of the vehicle, including any closed containers therein. *Id.; see also California v. Acevedo*, 500 U.S. 565, 569–70, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). But it may not

7. Although the vehicle was registered to Mrs. Wogan, it is clear that the defendant possessed a reasonable expectation of privacy in the vehicle, permitting him to challenge the searches at issue. *See Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Mrs. Wogan testified that her grandson could use the vehicle "anytime he wants to," without asking for her permission. (Doc. 44 at 96–97). This authority plainly vested the defendant with a possessory interest in the vehicle and a reasonable expectation of privacy in its contents. *See United States v. Baker*, 221 F.3d 438, 441–43 (3d Cir.2000) (finding that individual driving a car with permission

of registered owner had reasonable expectation of privacy and could challenge search).

8. Originally anchored to safety concerns (ensuring that areas within a suspect's reach are free of weapons), *see New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), this exception to the warrant requirement has since been cut from its mooring, *see Thornton*, 124 S.Ct. at 2133–38 (Scalia, J., concurring in judgment). Under recent Supreme Court precedent, police may search the compartment of an automobile even after a suspect is removed from the area and secured in a police vehicle. *Id.* at 2130–31.

extend into the trunk of the vehicle unless justified by independent grounds, such as "probable cause" to anticipate the presence of contraband. *Id.*

■ Like other Fourth Amendment principles, probable cause is an amorphous concept. *See Ornelas,* 517 U.S. at 695–96, 116 S.Ct. 1657. It is "not readily, or even usefully, reduced to a neat set of legal rules." *Id.* (quoting *Gates,* 462 U.S. at 232, 103 S.Ct. 2317). Its existence must be determined from the view of the officer on the street, not the judge in the courtroom. *United States v. Sokolow,* 490 U.S. 1, 7–8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *see also United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The dispositive question is whether the investigating officer, with his or her experience and based on the facts then known, could have reasonably concluded that the area to be searched more likely than not contained evidence of a crime. *Gates,* 462 U.S. at 230–31, 103 S.Ct. 2317 (citing *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)); *see also Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

■ In this light, probable cause to search the trunk was clearly lacking in the case *sub judice.* The *modus operandi* of the crimes at the employee parking lot involved Hill's rapid entry into parked cars, theft of easily removable items, and return to the car driven by the defendant. This approach did not allow Hill or the defendant to access the trunk of the vehicle but required them to keep the appropriated items in the passenger compartment. Officer Dale confirmed that he had initially assumed that the contents of the passenger compartment represented the entire proceeds of the evening's criminal enterprise. (Doc. 44 at 88–89). By his own admission, Officer Dale did not have probable cause to believe that additional contraband was contained in the trunk.

■ The government understandably does not argue that Hill's request that Officer Dale retrieve his possessions from the trunk justified the search. Hill did not state that the items were stolen or otherwise suggest that evidence of criminal activity would be found in the trunk. *See Acevedo,* 500 U.S. at 569–70, 111 S.Ct. 1982 (stating that officers may search trunk of vehicle when they have probable cause to believe evidence of criminal activity will be found). Nor did the circumstances plausibly suggest that Hill had authority to consent to the search. Hill was merely a passenger in the vehicle and did not give any indication that he exercised any control over the vehicle—or the trunk in particular. *Cf. Illinois v. Rodriguez,* 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (stating that, when an individual exercises apparent authority over an area, officers may justifiably rely on consent to search); *see also United States v. Anderson,* 859 F.2d 1171, 1176–77 (3d Cir. 1988). The request that initiated the constitutional violation is otherwise constitutionally insignificant.

It should be stressed that at no time did Officer Dale ask the defendant for permission to search the trunk. Mr. Wogan was being held in a car a few feet away, and his consent would have obviated the constitutional concerns now implicated. *See id.* Nevertheless, Officer Dale simply acquiesced to Hill's request, committing a Fourth Amendment violation in the process. Officer Dale's altruistic motives do not excuse this infringement.[9] *See Whren*

9. The court reiterates its conviction that, although Officer Dale acted in derogation of the defendant's constitutional rights, he also acted in good faith. "Traffic stops can be unpredictable, fluid episodes [that] test even the most experienced law enforcement officers." *United States v. Gayle,* No. 1:03–CR–06, slip

v. United States, 517 U.S. 806, 811–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (holding that motive of officers is generally irrelevant to Fourth Amendment analysis).

### B. Search Following Consent

■ But the unlawfulness of the initial search does not necessarily taint the second. Evidence obtained in violation of the Fourth Amendment must be suppressed only when there exists a causal connection between the illegality and the evidence to be introduced. Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); United States v. Burton, 288 F.3d 91, 99–100 (3d Cir.2002). When a lawful search supported by independent grounds intervenes between an unlawful search and the seizure of evidence, the taint of the first search is considered sufficiently purged to permit the admission of the evidence at trial. Segura v. United States, 468 U.S. 796, 805, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); see also United States v. Vasquez De Reyes, 149 F.3d 192, 194–95 (3d Cir.1998). The second search must be justified exclusively by facts and circumstances distinct from the first. The controlling question is "whether the evidence to which instant objection is made has been come at by exploitation of that illegality." Wong Sun, 371 U.S. at 488, 83 S.Ct. 407 (emphasis added), quoted in United States v. Zarintash, 736 F.2d 66,

73–74 (3d Cir.1984) ("Evidence is not inadmissible 'simply because it would not have come to light but for the illegal actions of the [authorities]'; rather, the question is whether the evidence has been discovered by means sufficiently distinguishable to be purged of the primary taint.").[10]

■ The intervening event in this case was the consent of Mrs. Wogan, obtained following the first, unlawful search of the vehicle. Voluntary consent is a recognized exception to the warrant requirement and permits police to search all areas within the scope of the consent. United States v. Drayton, 536 U.S. 194, 200–01, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002); United States v. Velasquez, 885 F.2d 1076, 1081–82 (3d Cir.1989). Whether consent was voluntary depends on the totality of the circumstances, including the age and mental state of the person and his or her prior experience with law enforcement. Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)); see also United States v. Givan, 320 F.3d 452, 459 (3d Cir.2003).

■ The consent obtained from Mrs. Wogan was causally related to the prior unlawful search and, as such, was constitutionally ineffective to permit the second search. Prior to the officers' arrival at her home, Mrs. Wogan had been apprised of the arrest of her grandson and the discov-

---

op. at 6 (M.D.Pa. Aug. 8, 2003). Officer Dale had just arrested the driver of a vehicle that was to be impounded and allegedly contained items belonging to a third person. It is understandable that Officer Dale would, to facilitate the return of Hill's belongings, open the trunk and remove the bags prior to seizure of the vehicle. That this action, intended to honor Hill's ownership rights in the bags, might also impinge on the defendant's expectation of privacy in the trunk is somewhat counterintuitive and, indeed, was probably not considered as these events unfolded. Nevertheless, the search plainly violated the defendant's Fourth Amendment rights, war-

ranting suppression of the evidence obtained. See Arizona v. Evans, 514 U.S. 1, 10–16, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995); United States v. Leon, 468 U.S. 897, 906–13, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

10. See also Nix, 467 U.S. at 443, 104 S.Ct. 2501 ("[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred.").

ery of potentially illegal contraband in the trunk.[11] The police had the car in their custody. They had already searched it. Mrs. Wogan reasonably viewed the officers' *post hoc* request for consent as a mere formality, required to satisfy bureaucratic niceties rather than constitutional necessities. Although the officers did not expressly reinforce this misapprehension, they did not dispel it. To the contrary, they capitalized on the situation by securing Mrs. Wogan's execution of a consent form that facially proclaimed the voluntariness of her decision.

That Mrs. Wogan's will was overborne in this case is mostly clearly demonstrated by Mrs. Wogan's remark to officers before she signed the consent form. Mrs. Wogan said that she did not want to get her grandson "into any trouble." (Doc. 44 at 26–29). If this was indeed her primary concern—and the court particularly credits Mrs. Wogan's testimony on this point—then her decision to permit the search makes no sense. Mrs. Wogan had significant experience in dealing with law enforcement (by virtue of her grandson's lengthy arrest record), and presumably knew that she possessed the right to refuse consent under normal circumstances. The only plausible explanation for her acquiescence in this case is that she was implicitly coerced into signing the document. It is entirely reasonable for a person in Mrs. Wogan's position to believe that refusal to allow a search of her vehicle

would be not only pointless—since police had already searched the vehicle and discovered illegal contraband—but potentially criminal. The first, unlawful search provided the means by which police subverted Mrs. Wogan's will and secured her consent for a search that could only bring further legal difficulty to her grandson.[12]

█ Moreover, other circumstances independently support a finding of involuntariness. Mrs. Wogan is an elderly woman. Based upon her testimony, it is clear to the court that she often experiences difficulty comprehending questions posed to her. These difficulties were exacerbated on the day of the officers' visit, which occurred while she was on several medications and just before she was hospitalized. Her condition should have been readily apparent to the officers, who took no greater precaution to ensure her understanding of the situation than to read the language on the standard consent form. Mrs. Wogan's daughter-in-law was present during this encounter, but it is unclear what assistance she offered to Mrs. Wogan regarding the decision to grant consent. *See Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041 (discussing circumstances relevant to determination of voluntariness). None of the testimony introduced credibly supports a finding that her consent was voluntary, and the government has failed to establish that the second warrantless search was lawful.

---

11. The court makes this finding by a preponderance of evidence presented at the suppression hearing. *See United States v. Pelullo*, 173 F.3d 131, 135–38 (3d Cir.1999); *see also Ornelas*, 517 U.S. at 695–98, 116 S.Ct. 1657; *Givan*, 320 F.3d at 459. Mrs. Wogan testified that she had known about the search prior to meeting with officers and that Officer Dale had confirmed to her that "some items" had been found in the vehicle. (Doc. 96–98, 100–07). Although Mrs. Wogan was unable to identify clearly the initial source of her knowledge, it seems likely that her daughter-in-law,

who had been notified by Officer Dale on the previous evening of the discovery of illegal contraband, had passed this information to Mrs. Wogan prior to or during the meeting with the officers.

12. *See United States v. Liss*, 103 F.3d 617, 621 (7th Cir.1997) ("[The] danger [that police would exploit illegally obtained knowledge to coerce an individual into providing consent for another search] would seem to loom larger where the illegal search and subsequent consent search were of the same location.").

### III. *Conclusion*

Neither of the two searches conducted in this case was permissible under the Fourth Amendment. The first was clearly unwarranted as incident to arrest and was not supported by probable cause. The second was tainted by the first, and lacked the voluntary consent of the owner of the vehicle.[13]

The evidence obtained as a result of the unconstitutional searches will be suppressed. This obviously portends difficulty in the government's case-in-chief. But this result, however detrimental to the instant prosecution, is necessary to honor the fundamental liberties embodied in the Fourth Amendment. *See Arizona v. Evans,* 514 U.S. 1, 10–16, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995); *United States v. Leon,* 468 U.S. 897, 906–13, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). That one who may be guilty goes free is a small price to ensure that all who are innocent live freely.[14]

### ORDER

AND NOW, this 19th day of January, 2005, upon consideration of defendant's motion to suppress (Doc. 20), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the motion (Doc. 20) is GRANTED and the evidence obtained as a result of the search of the trunk of the vehicle registered to Grace Wogan shall be SUPPRESSED from introduction at trial in the above-captioned case.

---

**13.** The inevitable discovery rule also provides an exception to the exclusionary rule and is often applied in cases in which officers conduct an illegal vehicle search prior to impoundment. *See, e.g., United States v. Haro–Salcedo,* 107 F.3d 769, 773 (10th Cir.1997). If a police department performs an "inventory search" of impounded vehicles as a matter of standard policy, then evidence obtained by an officer during a prior, illegal search is nonetheless admissible because it inevitably would have been discovered through constitutional means. *See Vasquez De Reyes,* 149 F.3d at 194–95 (3d Cir.1998); *Haro–Salcedo,* 107 F.3d at 773; *see also Florida v. Wells,* 495 U.S. 1, 3–4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990) (upholding warrantless inventory searches conducted as a matter of standard policy). As Officer Dale confirmed, however, the Carlisle Police Department does not have a standard policy of searching vehicles following impoundment. (Doc. 44 at 72–73). Hence, the inevitable discovery rule has no application in this case.

**14.** *See Silverthorne Lumber v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920) (Holmes, J.); *Brinegar v. United States,* 338 U.S. 160, 180–82, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting); *Olmstead v. United States,* 277 U.S. 438, 478–79, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).